RICHARD A. ERNEY, Associate Director, State Historical Society ofWisconsin
You have requested my opinion as to whether the State Historical Society of Wisconsin may dispense fermented malt beverages under the following circumstances: "As part of its recreation of a village of the 1890'S, the Society plans to erect a replica of a tavern at Stonefield Village in Nelson Dewey State Park. In order to maintain the realism of the historic recreation, we would like to offer beer for sale to visitors at the village." It is my understanding that Stonefield Village was created to depict rural midwestern life before the turn of the century. The village contains a school, church, shops, cheese factory, railroad station, village craft and business places showing the life and economy of a rural community of that day. Among the shops are a confectionary where candy, ice cream and soft drinks are sold and a general store where packaged foods, such as meats and cheese, are sold. The village is located in Nelson Dewey State Park and is operated in conjunction with the State Farm and Craft Museum which was specifically created by the legislature in 1953, see ch. 290, Laws of 1953, which created sec. 44.12, Stats.
Your question raises the three issues of, (1) whether the Society may engage in such commercial activity, (2) whether the fact of such activity taking place in a state park is of legal significance, and (3) local governmental control, if any.
The Society May Sell Fermented Malt Beverages.
The State Historical Society of Wisconsin is an agency of the State. (Sec. 44.01, Stats.) As such, it has those powers which *Page 186 
have been expressly granted by the legislature and may additionally exercise those powers which may be implied as being necessary in the performance of its express authority or duties.Nekoosa-Edwards Paper Co. v. Public Service Comm. (1959), 8 Wis.2d 582,99 N.W.2d 821; Sec. 44.01 (1), Stats.
The Society, of course, does not have express authority to dispense fermented malt beverages, but it does have authority under sec. 44.02 (5), Stats., to engage in commercial activity. This subsection reads, in part:
 ". . . The society may also procure and sell or otherwise dispose of postcards, souvenirs and other appropriate merchandise to help defray the costs of operating its several plants and projects."
The question does not involve the issue of implied power, but involves rather the question of whether fermented malt beverages constitutes "appropriate merchandise" within the intent of sec.44.02 (5), Stats.
Whenever a series of objects are described in a statute, the doctrine of statutory construction referred to as ejusdem generis
immediately becomes a possible guide to legislative intent. The court, in State ex rel. Thompson v. Nash (1965), 27 Wis.2d 183,133 N.W.2d 769, described this principle of statutory construction as being applicable when a general word follows a specific word in enumeration, the general word is construed to embrace something similar in nature to the specific word.
The word in the statute which precedes the language "other appropriate merchandise," is the word "souvenir." "Souvenir" is defined in Webster's Seventh New Collegiate Dictionary as:
". . . something that serves as a reminder: memento."
Accordingly, a souvenir is something in the mind of the beholder, rather than any particular type of object. The word describes nothing and everything capable of transfer and ownership. "Souvenir" is not a specific word in the sense of describing a particular object or class of objects, and for this reason, the doctrine is inapplicable.
It is also apparent that application of ejusdem generis would render the phrase "other appropriate merchandise" meaningless. *Page 187 
This is true, for the word "souvenir" is so general and nondescript that there would be no necessity to follow it by another nondescript or general word. In other words, if one were to apply this principle of statutory construction, we would be saying that the statute allows the Society to sell souvenirs and other appropriate souvenirs. It is a cardinal rule of statutory construction that statutes be construed so as to give force and effect to every word or clause and no word or clause should be rendered surplusage. Garfield v. United States, 297 F. Supp. 891, (W.D., 1969); Northern Discount Co. v. Luebke (1959), 6 Wis.2d 313,94 N.W.2d 605.
Applying this latter rule of statutory construction to the statute under consideration, it is my opinion that the words "other appropriate merchandise" refer to the sale of any merchandise which is in harmony with and furthers the statutory responsibility of the Society to illustrate, portray and preserve the history of the State of Wisconsin. This construction gives proper meaning and emphasis to the word "appropriate" by limiting the commercial activity of the Society to those objects and things which can be and are directly related to the objectives of the Society.
The brewing of beer and the circumstances and setting surrounding its consumption is, indeed, an appropriate object of historical interest. During the heyday of the temperance movement, Mr. F. W. Salem wrote an extended treatise promoting beer as the compromise between total abstinence and excessive whiskey drinking:
 "As extremes do and must perforce exist, the noblest philosophy of life is compromise.
 "Temperance then is the truest medium between total abstinence and excess, and in the same manner, beer
occupies the medium position between ardent spirits and water."[1]
Mr. Salem traces the history of beer back thousands of years:
 "Beer is mentioned by Manathos, High Priest of Heliopolis, an Egyptian of Greek education, who lived about 300 B. C. and by Command of Ptolemanus Philadelphus translated the old Egyptian history into Greek. He says that *Page 188 
the Egyptians, thousands of years before, had beer, and that its invention was attributed to Osiris, a divinity representing all the beneficient principles, also that celebrated breweries existed at that time at El Kahrich, the Cairo of Europeans, and at Pelusinium on the river Nile."[2]
Mr. Salem then follows the history of beer through the Roman period when it was reported by both Plutarch and Suetonius that Julius Caesar, after crossing the Rubicon in 49 B. C. gave a great feast at which he served cerevisia (beer). Charlemagne (742-814) is said to have given directions on how to brew beer and, in 1268, King Louis IX enacted a law relating to the purity of beer. According to William of Malmsbury, the best breweries in England at the time of Henry II were to be found in the Monasteries.
Mr. Salem states that the pioneers of brewing in the United States were William Penn and a Dutch brewer by the name of Jacobus who established a brewery on Manhatten Island in 1644. He later "became the first burgomaster and is said to have dispensed beer and justice with equal gravity and impartiality, and to the complete satisfaction of the inhabitants of new Amsterdam."[3]
Brewing in Wisconsin began in 1840, when Richard Owens started a small brewery in Milwaukee at the end of Huron Street.[4] By 1879, Wisconsin had 226 breweries and sold 583,068 barrels of beer. Today, however, Wisconsin has only eight breweries, four of which are among the ten largest nationally.
In addition to the importance of the brewing industry to Wisconsin, the integral nature of the tavern to the social, cultural and political life in Wisconsin is also worthy of note. In an article published in the 1914 Proceedings of the Wisconsin State Historical Society, John H. J. Lacher wrote:
 ". . . Whether village tavern, or wayside inn, it was the social center of the neighborhood. *Page 189 
 "The tavern of early Wisconsin discharged many functions. It furnished not only food, drink, and shelter, but was also the place for all indoor amusements, such as dances, concerts, lectures, puppet shows and wax figure exhibitions, for which purposes a suitable hall was usually provided. This hall was also the meeting place of secret societies, like the Masons, Odd Fellows, and the Oriental Evanic Order of 1001, the last named burlesque secret organization then quite popular. Here, too, were held caucuses, town meetings, conventions and elections. The dearth of churches and public buildings in the communities enhanced still more the importance of the tavern, for in their absence the hall was used for religious services or session of the court.
* * *
 "While there were a few temperance houses scattered over the State the bar was a prominent feature of nearly all taverns. Advertisements generally mention the choice quality of the beverages kept in stock. The following unique announcement of 1852 was surely a sign of the times:
 "`Planters' House, Hales Corners, Greenfield, Milwaukee County, by William Hale. `A litter of the critter to be had if desired.'" (advertisement in Western Star, Elkhorn, June 10, 1852)[5]
Mr. Lacher also took pains to note that those who ran the taverns were prominent individuals who often engaged in such other activities as running the livery stable, stage line or ferry, had a farm or general store or held public office:
Mr. Lacher stated:
 "The foregoing brief description of the taverns of early Wisconsin will suffice to show what important institutions they were to the people of that period and how variously and deeply they affected their lives. It also indicates that the landlords were generally men of consequence in their communities, and that their genial hospitality and wide acquaintance gave them vantage in gaining public esteem and increasing their information, as well as making pecuniary *Page 190 
profit. It is not surprising, therefore, that this occupation attracted men of character and ability, and that many of them attained prominence in their counties and the State, while a few acquired even a national reputation. Very many landlords held county offices, a large number served in the Legislature, two went to Congress and one, General J. M. Rusk, after being governor of the State for three terms, finished his distinguished public career as a member of the President's cabinet. It is to be noted that several clergymen were among the tavernkeepers of that period, but that their ventures were not signally successful. There were also some physicians and lawyers who engaged in this occupation."[6]
This sampling certainly shows that the place of taverns and of beer in the history of Wisconsin (and, indeed, of the world) is quite secure and is one of which any court could easily take judicial notice.
The sale of candy, ice cream, meats and cheese in the recreated village settings adds realism to the portrayal of history. In the same manner, the selling of beer in the recreated village tavern illustrates and adds realism to the portrayal of the scene. Under the circumstances described in this letter, the dispensing of fermented malt beverages is appropriate under the provisions of sec. 44.02 (5), Stats.
 The Fact That The Society Proposes To Dispense Beer Within A State Park Is of No Legal Consequence.
I am unable to find any legislative prohibition that would preclude the Society from dispensing beer on State park grounds. Nor does there appear to be any public policy against governmental dispensing of beer on park lands. For example, see sec. 66.054 (5) (e), Stats., which specifically exempts counties, cities, towns and villages from the licensing requirements of sec. 66.054, when such local governmental bodies engage in selling beer on park grounds. *Page 191 
The lands in question are under the jurisdiction of the Department of Natural Resources. I find no administrative rule by that agency that would be relevant.
I have been advised the Department does have a policy which does not favor the proposed activity of the Society and that the Department actually discourages such activity. I have been advised that currently, beer is dispensed on the grounds on only one state park.
I assume the Society has a formal arrangement with the Department regarding its use of these park lands. This agreement, while not essential to its validity, may have been entered into pursuant to the provisions of sec. 44.12, Stats.
It is my suggestion that the Society confer with the Department regarding this proposed activity.
 The Society Would Not Be Subject To Local Licensing.
The Society, as an agent of the State, is not subject to local control and regulation in the dispensing of fermented malt beverages.
This office, in 59 OAG 55 (1970), rendered the opinion that the State agency, then known as the Wisconsin State Universities System, was not subject to local regulation under sec. 66.054, Stats., in the dispensing of beer on the several campuses.
There has been no change in sec. 66.054, which would render this opinion obsolete.
Accordingly, it is my opinion that the Society would not be subject to licensing or local control and regulation under sec. 66.054 in the dispensing of fermented malt beverages.
BCL:CAB:SD
[1] F. W. Salem, Beer, its history and its economic value as aNational Beverage. (F. W. Salem Co., Hartford, Conn., 1880). Reprinted in 1972 by Arno Press, New York. p. 11.
[2] Salem, p. 16. See also Wayne L. Kroll, Badger BreweriesPast and Present (private printing) p. 10, where it states that man has been making beer for 6,000 years.
[3] Salem, p. 35. See also George Ehret, Twenty-Five Years ofBrewing (The Gast Lithograph Engraving Co., New York 1891) p. 7.
[4] Kroll, p. 1. Robert Nesbit, Wisconsin. A History
(University of Wisconsin Press, Madison 1973) p. 333, notes that "unfortunately for the advertising Milwaukee's first brewery, in 1840, was started by a Welshman making ale."
[5] John H. J. Lacher, "The Taverns and Stages of Early Wisconsin," Wisconsin State Historical Society Proceeding, 1914. Revised 1935. pp. 119-20, 128.
[6] Lacher, p. 130. Fred L. Holmes Old World Wisconsin: AroundEurope in the Badger State (E. M. Hale Co., Eau Claire 1944) p. 71 states that "[a]mong Germans the tavern is a community club house. After church the whole family before returning to the farm, is likely to enter to drink beer, while sitting around a table talking with friends and neighbors."