NEKOOSA-EDWARDS PAPER COMPANY and others, Petitioners and Respondents, v. PUBLIC SERVICE COMMISSION, Appellant: WOOD COUNTY, Intervenor and Respondent. [Two cases.]

*November 5—December 1, 1959.*

For the appellant there was a brief and oral argument by *William E. Torkelson,* chief counsel.

For the respondents Nekoosa-Edwards Paper Company and others there were briefs by *Chambers & Nash* of Wisconsin Rapids, and *Robert R. Johnson* of Port Edwards, and oral argument by *Mr. Lloyd L. Chambers* and *Mr. Johnson.*

For the respondents Okray Produce Company and Alois Firkus there was oral argument by *H. D. Anderson* of Stevens Point.

For the intervenor-respondent Wood county there was a brief and oral argument by *Morgan L. Midthun,* district attorney.

A brief was filed by *Wickham, Borgelt, Skogstad & Powell* of Milwaukee, for the Wisconsin Agricultural Water Users, Inc., as *amicus curiae.*

HALLOWS, J. The important question presented on these appeals which in our view of the cases makes it unnecessary to

consider any others is: Does sec. 31.14, Stats., confer upon the Public Service Commission the jurisdiction to determine and regulate the common-law rights of all riparian owners to the use of nonsurplus water in a navigable stream? To determine this question requires a construction of sec. 31.14 which heretofore has not been construed. The primary source of construing the statute is the language of the statute itself. Sec. 31.14 is set forth in part in the footnote.[1]

[1] "31.14 DIVERSION OF SURPLUS WATERS. (1) It shall be lawful to temporarily divert the surplus water of any stream for the purpose of bringing back or maintaining the normal level of any navigable lake or for maintaining the normal flow of water in any navigable stream, regardless of whether such navigable lake or stream is located within the watershed of the stream from which the surplus water is diverted, and water other than surplus water may be diverted with the consent of riparian owners damaged thereby for the purpose of agriculture or irrigation but no water shall be so diverted to the injury of public rights in the stream or to the injury of any riparians located on the stream, unless such riparians shall consent thereto.

"(2) Surplus water as used in this section means any water of a stream which is not being beneficially used.

"(3) The public service commission may determine how much of the flowing water at any point in a stream is surplus water.

"(4) Before any water may be diverted for the purposes set forth in sub. (1), the applicant shall file an application with the public service commission setting forth . . . the name of the stream, the point in the same from which it is proposed to divert the surplus water, the name of the navigable lake or navigable stream or lands to which such water is to be diverted, . . .

"(8) At the conclusion of the hearing, if it shall appear that the water to be diverted is surplus water, or if not surplus water the riparians injured by such diversion have consented thereto, the commission shall so find and a permit for the diversion of such water shall issue. . . .

"(9) The quantity of water to be taken and the time or times when it may be taken shall be under the control of the commission, to the end that only surplus water be diverted from its natural channel, and that when any water in a stream ceases to be surplus water, the diversion of such water shall cease except that the commission may permit the diversion of other than surplus water with the consent of the riparian owners damaged thereby."

Sub. (1) of sec. 31.14, Stats., declares it to be lawful to temporarily divert surplus water of any stream to bring back or to maintain the normal level of a navigable lake or to maintain the natural flow of water in a navigable stream even though such lake or stream is not in the same watershed. Nonsurplus water may be diverted with the consent of the riparian owners damaged thereby for the purpose of agriculture or irrigation. However, no water shall be so diverted to the injury of public rights or of any riparian owners unless such riparian shall consent thereto. The language of the statute seems clear. It makes a distinction between the diversion of surplus water and nonsurplus water and the purposes of such diversion and the conditions on which nonsurplus water may be diverted.

In sub. (2) of sec. 31.14, Stats., surplus water is defined as any water of a stream which is not being beneficially used. Logically, nonsurplus water or water other than surplus water must be any water in a stream which is being beneficially used. The Public Service Commission is granted by sub. (3) the authority to determine how much of the flowing water at any point in a stream is surplus water. This is a logical provision since it is necessary in each case and from time to time to determine what water in any stream is surplus under the definition in sub. (2) as applied to the particular facts. Thus, to determine whether a riparian's consent is needed for diversion, the Public Service Commission must determine whether the proposed diversion is of surplus water or nonsurplus water. Sub. (8) provides that if the commission shall find either alternative a permit for diversion shall issue. Sub. (9) places control over the diversion in the Public Service Commission so that only surplus water shall be diverted and such diversion shall cease when the water in the stream ceases to be surplus water unless the riparian owners damaged by the diversion of nonsurplus water consent.

The commission contends it has the jurisdiction to determine whether the diversion of nonsurplus water will damage or injure riparian owners and if it finds no such injury the consent of such owners is not required. We find no authority in the statute for this position. The statute contemplates that a beneficial user is damaged or injured by the diversion of nonsurplus water and requires his consent. The commission having determined that the flow of water in a stream is not surplus water because it is being beneficially used by riparian owners, it follows that any diversion of such nonsurplus water as a matter of law would injure the riparian owners beneficially using such water and their consent must be obtained.

This is the only construction consistent with the rights of riparian owners in streams. The language of sec. 31.14, Stats., does not grant jurisdiction to the Public Service Commission to determine or adjust the rights of riparian owners injured because of a proposed diversion of nonsurplus water. The power of the Public Service Commission is limited to granting permits for the diversion of surplus water, and in the case of waters determined by it to be nonsurplus, only for agriculture and irrigation purposes when the riparian owners beneficially using such nonsurplus water have consented to such diversion. It is to be noted sec. 31.14 does not provide any standard for the determination of the relative rights of claimants to water, or for any consumptive use except agriculture and irrigation by consent of riparian owners for nonsurplus water.

This construction is substantiated by the legislative history of the act. Bill No. 234, A., which became ch. 287, Laws of 1935, was entitled, "An Act to create section 31.14 of the statutes, relating to relief of low water conditions of navigable rivers and lakes." As originally drafted the bill was designed to permit diversion from one stream to maintain the normal level or flow in another stream or lake. The pro-

vision applying to the use of nonsurplus water for agriculture and irrigation was added later. See bill jacket on ch. 287, Laws of 1935, Wisconsin legislative reference library. Mr. Adolph Kanneberg, a former commissioner of the Public Service Commission and an expert on water power, was a consultant and assisted in drafting this statute. In his article on "Wisconsin Law of Waters," 1946 Wisconsin Law Review, 345, 372, in discussing sec. 31.14, Stats., he states, "A riparian owner who is injured by the diversion may obtain redress from the courts in the form of damages or in certain cases by injunction upon a showing that the diversion is an unreasonable use in excess of the rights incident to riparian ownership. The act therefore provides that only surplus water may be diverted and that the diversion must cease as soon as the water to be diverted is no longer surplus water." On page 373, he stated the provision in the act that water other than surplus water may be diverted with the consent of the riparians affected thereby was inserted in the interest of cranberry growers. Many instances of permits granted for the diversion of surplus water during the years 1937 to 1940 are given. It is significant that no application was made for the diversion of nonsurplus water for irrigation purposes until 1950, some fifteen years after the statute was passed.

The difficulty in this case is using a statute designed for a particular purpose to ascertain rights for a wholly different purpose. The primary purpose of sec. 31.14, Stats., was to provide a remedy for the subnormal lake and stream levels caused by the dry spell of the early 1930's. Its application in this case is to ascertain rights of consumptive use by irrigators by means of a permit system.

It is argued that such background material is not a proper aid to statutory construction, relying on *Moorman Mfg. Co. v. Industrial Comm.* (1942), 241 Wis. 200, 5 N. W. (2d)

743, and *Papke v. American Automobile Ins. Co.* (1946), 248 Wis. 347, 21 N. W. (2d) 724. These cases are to the effect that what the framer of an act meant by the language used cannot be shown by testimony or his statements. The meaning of a legislative act must be determined from the language used. This language may or may not express accurately what the framer of the act intended to say or what he thought he was saying. In determining the meaning of the language, the court can take judicial notice of the legislative history of acts which are public records. Such material is not determinative, but is sometimes helpful in construing legislative acts. Since the *Moorman* and *Papke Cases* were decided, this court has several times made use of such material to substantiate a construction of the language of an act or to aid in choosing one of two or several reasonable constructions in order to adopt that construction consistent with the purpose of the act. See *Larson v. Lester* (1951), 259 Wis. 440, 49 N. W. (2d) 414; *Matczak v. Mathews* (1953), 265 Wis. 1, 60 N. W. (2d) 352 (documents); *Nolan v. Wisconsin R. E. Brokers' Board* (1958), 3 Wis. (2d) 510, 543, 89 N. W. (2d) 317 (correspondence); *Wisconsin Valley Improvement Co. v. Public Service Comm.* (1959), 7 Wis. (2d) 120, 124, 95 N. W. (2d) 767; and *Muench v. Public Service Comm.* (1952), 261 Wis. 492, 510, 53 N. W. (2d) 514, 55 N. W. (2d) 40 (law-review articles by the chairman of the drafting committee which were not a part of the legislative history file).

It is contended that the Public Service Commission has given a practical construction to sec. 31.14, Stats., from 1950 to the present time in some 138 cases to the effect that the commission has the jurisdiction to grant permits for the diversion of nonsurplus water without the consent of riparian owners when the commission finds such owners are not substantially injured by such diversion. There may be a dispute

whether such cases are in the record and what they held. Be that as it may, a construction of a statute by a state agency dealing with its own power is quite different from a construction dealing with administrative procedure, but in both cases an agency construction is not binding on this court and has pertinency only when the statute is ambiguous and needs construction. *State ex rel. Raymer v. Cunningham* (1892), 82 Wis. 39, 51 N. W. 1133; *Travelers' Ins. Co. v. Fricke* (1896), 94 Wis. 258, 68 N. W. 958; *Waldum v. Lake Superior T. & T. R. Co.* (1919), 169 Wis. 137, 170 N. W. 729. The case of *Frankenthal v. Wisconsin R. E. Brokers' Board* (1958), 3 Wis. (2d) 249, 88 N. W. (2d) 352, 89 N. W. (2d) 825, cited by the commission is not authority for its position because no ambiguity exists in the statute.

The construction urged by the Public Service Commission creates a third class of cases not found in the language of the statute, namely, situations in which riparian owners are beneficially using nonsurplus water, and the commission finds are not substantially injured by the diversion of such water and therefore their consent is not required. This construction creates a permit system for the consumptive use of nonsurplus water for the purpose of agriculture and irrigation. This interpretation ignores subs. (2) and (3) of sec. 31.14, Stats., and is based primarily upon inferences drawn from subs. (1), (8), and (9). No reasonable inference of legislative intent to simultaneously create a permit system for the consumptive use of water can be read into sec. 31.14 by ignoring subs. (2) and (3). In arriving at the intention of the legislature we must give all the words of the act their ordinary and accepted meaning and read the subsections together. *State v. Resler* (1952), 262 Wis. 285, 55 N. W. (2d) 35.

It is stated in 50 Am. Jur., Statutes, p. 40, sec. 19, "If an affirmative statute, which is introductory of a new law,

direct a thing to be done in a certain manner, that thing shall not, even though there are no negative words, be done in any other manner, the mode prescribed by statute for the exercise of a power, must be adopted." The Public Service Commission is an administrative body created by the legislature and possesses neither legislative nor judicial functions. Sec. 31.14 (8), Stats., requires it to exercise its delegated powers to conduct hearings and determine certain facts. When such facts are found the permits contemplated by the statute are to be issued. The commission is not authorized to go further. *Madison Rys. Co. v. Railroad Comm.* (1924), 184 Wis. 164, 198 N. W. 278. Administrative boards and commissions have no common-law power. Their powers are limited by the statute conferring such powers expressly or by fair implication. 42 Am. Jur., Public Administrative Law, p. 316, sec. 26.

The question on these appeals is not what are the rights of riparian owners or whether this section modified those rights or adopted the prior-use doctrine, but whether the commission has been given the jurisdiction to determine those rights. The common-law rights of riparian owners here involved are unaffected by this decision; whether sec. 31.14, Stats., does affect such rights is not before us and is not decided. In the case of *Apfelbacher v. State* (1918), 167 Wis. 233, 239, 167 N. W. 244, it was stated, "But the right to detain for a time, as well as every other right which a riparian owner acquires, as such, to the waters of the stream flowing through or by his land, is restricted always to that which is a reasonable detention or a reasonable use, and these terms are to be measured and determined by the extent and capacity of the stream, the uses to which it is and has been put, and the rights that other riparian owners on the same stream also have. There can be no absolute or fixed standard for the measure of such relative rights. The essential question to be determined by the court or jury trying

the issues between the parties in each particular case is what is reasonable under the circumstances there presented." The reasonable-use doctrine of riparian rights is qualified in this state by the trust doctrine of public interest. The rights of the public in the water resources are well explained in the *Muench Case, supra.*

Sec. 31.14, Stats., deals with only a small part of the conflicting interests in the water resources of Wisconsin. Rights of the public, sportsmen, consumptive users such as farmers and irrigators, and nonconsumptive users such as hydro-electric power companies—and the rights of manufacturers, municipalities, and those people interested in recreation, conservation, and the enjoyment of natural scenic beauty—all are a part of the water problem. Many efforts and studies have been made in recent years by the legislature and others to solve this problem. See Coates, "Present and Proposed Legal Control of Water Resources in Wisconsin," 1953 Wisconsin Law Review, 256; Beuscher, "Wisconsin's Law of Water Use," 31 The Wisconsin Bar Bulletin, 30 (October, 1958); Modjeska, "Wisconsin's Water Diversion Law: A Study of Administrative Case Law," 1959 Wisconsin Law Review, 279; Wisconsin Legislative Council Report, 1959, Vol. 4, "Water Resources." In the Wisconsin Legislative Council report it is stated as a conclusion that there is no need for a major overhauling of the water-use laws such as was contemplated by Bills Nos. 483, S., and 616, A., of 1957. These bills, which were not passed by the 1957 legislature, would have abolished sec. 31.14 and would have provided for a general permit procedure for the withdrawal of water from streams for beneficial use. These bills expressly granted the Public Service Commission the power to administer the permit system and laid down standards to guide the commission in the exercise of its power in granting permits and in determining the rights of claimants to water.

The amendments of 1957 and 1959 to sec. 31.14, Stats., are not helpful in deciding the issue raised on these appeals. Such amendments modified what constituted riparian lands on which diverted water could be used and modified the source-of-title test for that purpose. The amendments did not deal with the power of the commission.

We find neither a purpose nor an intention of the legislature at the time of the creation of sec. 31.14, Stats., in 1935, or subsequently, in its acts dealing with the water problem compatible with the construction of that section urged by the commission. In our opinion the trial court was correct in reversing the orders of the Public Service Commission granting the permits.

*By the Court.*—Judgments affirmed.

BROWN, J., took no part.