Philip D. BALL, William N. Camplin, Henry Haslach and Rebecca Young, Petitioners-Appellants,

v.

DISTRICT NO. 4, AREA BOARD OF VOCATIONAL, TECHNICAL & ADULT EDUCATION, Respondent.†

Court of Appeals

*No. 83–503. Submitted on briefs August 11, 1983.— Decided October 13, 1983.*

† Petition to review granted.

For the respondent the cause was submitted on the brief of *Thomas G. Ragatz, Gordon Davenport III,* and *Foley & Lardner* of Madison.

Before Dykman, Bablitch and Cane, JJ.

CANE, J.   Appellants are taxpayers, voters, and residents of the City of Madison, which is within District No. 4, Area Board of Vocational, Technical, and Adult Education (district).  They appeal a judgment dismissing their petition for a writ of mandamus and complaint for declaratory relief against the district.  Appellants sought a writ of mandamus ordering the district to comply with the requirements of sec. 38.15, Stats.,[1] which governs the financing of capital expenditures by district

---

[1] Section 38.15, Stats., provides:

Financing of capital expenditures.  (1) Subject to sub. (3), if the district board intends to make a capital expenditure in excess of $500,000 for the acquisition of sites, purchase or construction of buildings, the lease/purchase of buildings if costs exceed $500,000 for the lifetime of the lease, building additions or enlargements or the purchase of fixed equipment relating to any such activity, it shall adopt a resolution stating its intention to do so and identifying the anticipated source of revenue for each project and shall submit the resolution to the electors of the district for approval.  The referendum shall be noticed, called and conducted under s. 67.05(6m)(b) to (e) insofar as applicable.  For the purposes of this section, all projects located on a single campus site within one district which are bid concurrently or which are approved by the board under s. 38.04(10) within a 2-year period shall be considered as one capital expenditure project.

(2) No more than $500,000 in reserve funds, consisting of property tax revenues and investment earnings on those revenues, may be utilized by the district board to finance capital expenditures in excess of $500,000 for the purposes under sub. (1).

(3) This section applies to building program actions approved by the board after January 31, 1980.  This section does not apply to capital expenditures in excess of $500,000 which are fully funded by gifts, grants or federal funds or to building remodeling or improvement projects.

boards. In the alternative, appellants sought a judgment declaring that the district's latest plan to construct new facilities for the Madison Area Technical College (MATC) is subject to the statute's requirements and an injunction to prevent further implementation of the plan absent compliance with the statute. The trial court dismissed the petition and complaint, concluding that sec. 38.15 did not apply because the district's plan was a "building program action" approved prior to January 31, 1980. Because we find no such approval contemplating the district's current plan, we reverse and remand with directions to grant the relief requested in the complaint.

The facts are not disputed. On November 27, 1973, the Wisconsin Board of Vocational, Technical and Adult Education (state board) discussed alternatives respecting new facilities for MATC. Upon being informed that the district board was under pressure from a number of sources to abandon the concept of an integrated campus, long favored by the state board, and to establish separate facilities in more than one location, the state board voted to "notify District 4 that the State Board is interested in an integrated campus."

On October 15, 1974, the state board adopted a resolution authorizing the district to proceed with plans to develop a central campus facility on East Washington Avenue in the City of Madison. Three weeks later, voters of the district approved by referendum a proposal that the district "borrow the sum of not to exceed $30 million for the purchase or construction of buildings and additions, enlargements and improvements to buildings and for the acquisition of sites and equipment by issuing its general obligation promissory notes." On November 19, 1974, the state board voted to commend the district for its efforts in connection with approval of the referendum. On January 25, 1975, responding to a request from

the district, the state board voted to permit the district to borrow $30 million "to build a central facility on a site previously approved by the State Board." The only site previously approved by the state board was the one on East Washington Avenue. About $4.2 million of the $30 million borrowed pursuant to the board's authorization has since been used for construction of new facilities at MATC's satellite campus locations outside of Madison.

By August, 1976, the East Washington Avenue site had apparently been abandoned. The state board adopted a resolution in that month approving the district's petition to construct new MATC facilities at Truax Air Park. On December 30, 1977, however, a circuit court ruled that the district could not proceed with the Truax plan until a satisfactory environmental impact statement was produced.[2]

The district then shifted its attention to a location in the Town of Burke. The state board adopted a resolution on November 21, 1978, granting the district permission to purchase property at the Burke site. The Burke plan met the same fate as the 1976 Truax plan.[3]

On April 30, 1980, sec. 38.15 became effective. Chapter 221, 1979 Wis. Laws. The statute requires voter approval of district board intentions to make certain capital expenditures in excess of $500,000, and prohibits use of more than $500,000 of the district reserve funds for such expenditures. This statute is applicable, pursuant to sec. 38.15(3), to "building program actions" approved by the state board after January 31, 1980.

On October 16, 1981, the state board adopted a resolution granting the district permission to construct a multiple location or "split" campus, with renovation and

[2] See State ex rel. King v. Wisconsin Board of VTAE, No. 155-417 slip op. (Dane County Cir. Ct. Dec. 30, 1977).

[3] See State ex rel. Capital Community Citizens v. Wisconsin Board of VTAE, No. 78–CV–2263 slip op. (Dane County Cir. Ct. Nov. 27, 1979).

expansion of facilities at existing MATC locations and new construction at Truax. This was the first time the board had endorsed a split-facility campus concept. The projected cost of the current plan is approximately $59 million, with about $50 million of the total attributed to construction plans for the Truax site. Two funds are available for this project. As of February 28, 1983, the area reserve fund, derived from tax dollars, had a balance of $11.6 million. The expansion note fund, derived from the $30 million referendum-approved borrowing, had a balance of $44.3 million.

The trial court concluded that sec. 38.15 did not apply to the MATC project because the 1973 state board vote constituted an approval of a "building program action" prior to January 31, 1980. Based upon our independent review of the record before us, this court disagrees with that conclusion.

The court of appeals independently decides questions of law without deference to the trial court's conclusion. *Nelson v. Union National Bank,* 111 Wis. 2d 313, 315, 330 N.W.2d 225, 226–27 (Ct. App. 1983). As the trial court found, the facts in this case are undisputed, and the question before us is one of law, to wit: whether any action of the state board prior to January 31, 1980, constituted an approval of the district's "building program action" within the meaning of sec. 38.15(3) so as to exclude the present MATC building plans from the referendum requirements of sec. 38.15(1).

■

Appellants point out that the first sentence of sec. 38.-15(3) is a statement of application rather than exemption, implying that board actions before January 31, 1980, are irrelevant to the question of whether the statute applies to later actions. The subsection provides in part: "[t]his section applies to building program actions approved by the board after January 31, 1980." By

necessary implication, such actions approved by the state board on or before that date are not subject to the referendum requirement and reserve fund restriction. This conclusion is supported by the opening words of subsection (1), which makes the referendum requirements "subject to sub. (3)." It is not significant that the clause is a statement of application rather than exception. A statement of application after a stated date must imply an exception to application prior to that date. A contrary construction would render the specification of a date of application meaningless. A statute should not be construed to render any portion or word meaningless. *See Donaldson v. State,* 93 Wis. 2d 306, 315, 286 N.W.2d 817, 821 (1980).

The district argues that the term "building program actions" in subsection (3) refers to the initial approval of an overall campus concept, rather than approval of specific details of a building project. To construe "building program actions" in so broad a way, however, is to make the word "actions" superfluous in the phrase as a whole. Such a construction is to be avoided. *Wisconsin Electric Power Co. v. PSC,* 110 Wis. 2d 530, 534, 329 N.W.2d 178, 181 (1983). Both parties advance various documents purported to demonstrate legislative intent concerning sec. 38.15(3). Where a statute is clear on its face, however, we will not look beyond the statutory language in applying it. *Wisconsin Electric Power,* 110 Wis. 2d at 534, 329 N.W.2d at 181. The language of subsection (3) is plain and was meant to encompass specific building projects such as the split-campus facilities approved by the board in October, 1981. Had the legislature intended to refer only to overall building concepts, it could have made the section applicable to "building programs approved by the state board." By inclusion of the word "actions," the legislature intended to make this

section apply to either detailed or general actions concerning building programs.

Application of sec. 38.15 is not determined solely by subsection (3), however. In determining the meaning of the phrase "building program actions approved," we must examine it in light of the entire statute. *See Alberti v. City of Whitewater,* 109 Wis. 2d 592, 598, 327 N.W.2d 150, 153 (Ct. App. 1982). Subsection (1), which sets forth the referendum requirements, by its own terms applies only "if the district board intends to make a capital expenditure in excess of $500,000" for the stated purposes. It is quite conceivable that the state board might approve building program actions that do not involve capital expenditures in excess of $500,000 or that are not for the purposes set forth in subsection (1). In light of the entire statute, it is apparent that the first sentence of sec. 38.15(3) makes this section applicable only to building program actions approved after January 31, 1980, that are within other scope limitations found within the statute.

We also construe sec. 38.15(3) as making this section inapplicable to any actions, regardless of the date of approval, that fall within the scope of a general building program approved by the state board as of January 31, 1980. It is possible that state board approval under other statutes, such as sec. 38.04(10), Stats.,[4] would be

---

[4] Section 38.04(10), Stats., provides:

Additional Facilities. The board shall review and approve any proposals by district boards for land acquisition, additional or new facilities, rentals and remodeling of existing facilities, prior to the letting of contracts to construct, remodel, rent or incur debt for such facilities or acquisition of land. The board shall encourage district boards to finance capital building proposals with long term benefits through bonding or promissory note obligations.

required for the detailed actions needed to carry into effect a general program approved before that date. To construe the statute as applying to such actions could lead to absurd results. For example, a district might have obtained state board and referendum approval prior to January 31, 1980, of a general proposal to build a new campus. Further building program actions, such as land acquisition, would require state board approval under sec. 38.04(10). If such an approval took place after January 31, 1980, one possible construction of sec. 38.15 could require another referendum, even though it might use language identical to the previous referendum. We must avoid construction of a statute leading to absurd or unreasonable results where an alternative construction is available. *State v. Burkman,* 96 Wis. 2d 630, 642, 292 N.W.2d 641, 647 (1980) ; *State ex rel. Brockway v. Milwaukee Co. Circuit Court,* 105 Wis. 2d 341, 344, 313 N.W.2d 845, 847 (Ct. App. 1983). The phrase "building program actions approved by the board after January 31, 1980," can be construed as applying only to actions that have received no board approval prior to the effective date. Under such a construction, later actions within the scope of a general building program approved earlier are not subject to sec. 38.15 even if the later action requires state board approval under another statute. Since this construction avoids absurd results, we adopt it.

The October, 1981, state board resolution granting the district permission to construct a split campus, with new facilities at Truax and expansion and renovation of existing facilities, was an approval, after January 31, 1980, of a district proposal that constituted a building program action. The action was not within the scope of any general action previously approved by the state board. The

project will clearly exceed $500,000. It is therefore subject to the requirements of sec. 38.15.

We disagree with the trial court's conclusion that the state board approved an overall campus concept prior to January 31, 1980, of which the 1981 approval was simply a step toward implementation. The 1973 state board vote was simply an expression of interest in an integrated or single-site campus. An expression of interest cannot be equated with an act of approval. No district proposal was before the board for approval at the time of the expression of interest. Even if the vote to "notify District 4 that the State Board is interested in an integrated campus" can be characterized as an approval, it certainly is not an approval of a split-campus building program such as the district is currently pursuing.

State board site approvals following the 1973 vote likewise do not constitute approval of the 1981 split-campus plan. The three pre-1980 specific site votes, East Washington Avenue in 1974, Truax in 1976, and Burke in 1978, all indicate building programs of a scope and type not encompassing the split-campus plan approved in 1981. In addition, the 1976 Truax approval was based in part on the board's assumption that the proposal had met the board's criteria of "clearance on the basis of the environmental impact statement." Since that environmental impact statement was later held insufficient in Dane County Circuit Court, and since the district and state board subsequently proceeded with other alternatives, we consider the 1976 approval, which was declared invalid, as abandoned. As such, it cannot constitute a pre-1980 approval of the current Truax project.

State board actions concerning the 1974 referendum also were not approvals of the current plan. Although the 1974 referendum itself is broad enough to encompass action at an unspecified location, a pre-1981 state board approval of such an action is necessary to prevent appli-

cation of sec. 38.15 to the 1981 Truax plan approval. The state board's vote to "go on record commending District 4 for their efforts in getting the $30 million bond referendum passed" is not an approval of a building program action. It is merely a vote to praise the district's efforts. The January 25, 1975, state board vote granting the district permission to borrow money to "build a new facility on a site previously approved" is a building program action specifically tied to the East Washington Avenue site approved in 1974. The 1981 Truax split-campus plan is not within the scope of that approval.

The district also argues that the 1974 referendum complied with sec. 38.15(1). The trial court, holding that the current MATC plan is exempt from the requirements of sec. 38.15, did not reach this issue. If the compliance issue should be resolved in favor of the district, the trial court's decision that no referendum on the current plan is required would be correct, and its conclusion regarding sec. 38.15(3) would be immaterial in that respect. *See Mueller v. Mizia,* 33 Wis. 2d 311, 318, 147 N.W.2d 269, 273 (1967). Since the facts are not in dispute, we consider the issue of compliance.

Section 38.15(1) imposes the following requirements on districts intending to make a capital expenditure in excess of $500,000 for the purchase, lease or construction of sites, buildings, additions or related equipment: (1) a resolution must be adopted and submitted to the electors of the district; (2) the procedures of sec. 67.05 (6m)(b) to (e), pertaining to the notice, call, and conduct of a referendum, must be followed; (3) the resolution must state the district's intention; and (4) the resolution must identify the anticipated source of revenue for each project. We conclude that, even assuming the 1974 referendum was sufficient under sec. 38.15 to authorize

a capital expenditure, such an expenditure has already been made by the district and another referendum is required for the planned MATC expenditure.

The identification of an anticipated source of revenue is required for each "project." The final sentence of sec. 38.15(1) states that "[a]ll projects located on a single-campus site, which are either bid concurrently or approved by the board under sec. 38.04(10) within a two-year period shall be considered as one capital expenditure project." We must construe parts of a statute in harmony with each other so as to produce a harmonious whole. *Milwaukee County v. DILHR,* 80 Wis. 2d 445, 454 n. 14, 259 N.W.2d 118, 123 n. 14 (1977). In addition, we may insert or reject words reasonably inferable in a statute. *State v. Gould,* 56 Wis. 2d 808, 812, 202 N.W.2d 903, 906 (1973). We therefore construe the term "projects" to mean any of the capital expenditures for which subsection (1) would require a referendum. We also conclude that the description of "capital expenditure project," contained in the final sentence of subsection (1), is meant to apply to the term "project" as used in the first sentence. Thus, the referendum resolution must identify an anticipated source of revenue for each acquisition of land and each purchase, lease, or construction of buildings, additions, enlargements or fixed equipment, which is not on a single-campus site and also is not either bid on concurrently or approved by the state board within a two-year period. If there is only one source of revenue for several intended projects, the district must indicate how many projects are planned and that each will be funded by the single anticipated source of revenue. A different construction would render the words "for each project" meaningless.

We recognize, however, that sec. 38.15(1), insofar as it expressly requires identification only of the source or

sources of revenue, can be read as not requiring specification of the number of capital expenditure projects intended to be covered by the referendum. When ambiguity exists in a statute's language, a reviewing court may resort to extrinsic aids in determining legislative intent. *State v. Stepniewski,* 105 Wis. 2d 261, 268, 314 N.W.2d 98, 101 (1982). Comments of legislative advisory committees are relevant to the construction of a statute. *State v. Stanfield,* 105 Wis. 2d 553, 561, 314 N.W.2d 339, 343 (1982). We consider the comments of the director of the Legislative Fiscal Bureau outlining alternative legislative approaches to be in this category of extrinsic evidence. On February 21, 1980, Bob Lang, Director of the Legislative Fiscal Bureau, submitted a memorandum to the Joint Committee on Finance, which drafted the language of sec. 38.15(1) passed by the legislature. Lang's memorandum discussed "Vocational, Technical and Adult Education—District Financing of Capital Expenditures." It noted that districts were attempting to avoid mandatory referenda due to the possibility of voter rejection of proposed "capital project expenditures." It advised:

If mandatory referenda seems the most direct way to ensure accountability, the statutes could be amended to *require all building* and remodeling[5] *projects* with costs in excess of $500,000 . . . irrespective of their funding source, *to be subjected to elector approval.* In addition, the districts could be required to identify the anticipated sources of funding for the proposed project so that their financing plans for a project would also be subject to elector approval. [Emphasis added.]

This clearly indicates an intent to require voter approval for both "projects" and financing plans. The language of sec. 38.15(1) requires a referendum when a district

---

[5] Remodeling projects are exempted from the statutory requirements. Section 38.15(3), Stats.

intends to make a "capital expenditure" (project) and requires identification of anticipated sources of revenue for "each project." Although the statute does not require the referendum to identify the specific plans of the project, we believe a construction requiring some identification of each project and its source of revenue was intended by the legislature.

The 1974 referendum was sufficient only with respect to one capital expenditure project. It did not identify an anticipated source of revenue for "each project" if more than one project was intended to be financed by the $30 million borrowed. Therefore, if money from the "expansion note fund" was used to finance a separate capital expenditure project prior to state board approval of the 1981 Truax split-campus plan, the 1974 referendum would not serve as compliance with sec. 38.15(1) for purposes of that plan. It is clear that the money borrowed pursuant to the 1974 referendum has been so used. The record indicates that in excess of $4 million of the money borrowed pursuant to the 1974 referendum was spent for the construction of new campus facilities at four different locations in District 4 from 1975 through 1981. Construction of new campus facilities is a type of activity within the scope of a capital expenditure project. These activities were carried on at four campus sites over a period of more than two years, and each required an expenditure of roughly $1 million. As such, these capital expenditures clearly make the 1974 referendum ineffective for any further capital expenditures from the remainder of this fund under sec. 38.15(1).

■ The record indicates that the current MATC plan had a projected cost of $58,970.000 in 1982. The district clearly intends to spend in excess of $500,000 for one or more capital expenditure projects. Ground breaking

ceremonies were held at Truax in March, 1983, and the district has presumably begun to spend money putting the project into effect. Since a referendum is required and the district's plan may be rejected by the voters, any money spent implementing the plan before a referendum may be wasted. The appellants are therefore entitled to an order enjoining the district from further expenditures as described in sec. 38.15 in connection with the Truax split-campus MATC plan until it has complied with the referendum requirement of sec. 38.15 (1).

We cannot determine from the record whether the district has yet spent more than $500,000 in reserve funds to finance any capital expenditure projects to which sec. 38.15 applies. Considering the total projected cost of the Truax split-campus MATC plan, however, the appellants are entitled to a judgment declaring that the district may use no more than $500,000 of reserve funds for any capital expenditure project connected with the plan to which this section applies.

Because we conclude that sec. 38.15 applies to the district's current plan for new MATC facilities and that the requirements of that section have not been met, we reverse and remand this matter with directions to the trial court to grant judgment for the appellants declaring that the section applies and enjoining further implementation of the plan until the district has complied with the referendum requirements of sec. 38.15(1).

*By the Court.*—Judgment reversed and cause remanded with directions.