Philip D. BALL, William N. Camplin, Henry Haslach and Rebecca Young, Petitioners/Plaintiffs-Appellants,

v.

DISTRICT NO. 4, AREA BOARD OF VOCATIONAL, TECHNICAL & ADULT EDUCATION, Respondent/Defendant-Respondent-Petitioner.

Supreme Court

*No. 83–503. Argued March 1, 1984.—Decided March 27, 1984.*

(Also reported in 345 N.W.2d 389.)

530

For the respondent-petitioner there were briefs by *Thomas G. Ragatz, Michael B. Van Sicklen, Gordon Davenport III,* and *Foley & Lardner,* Madison, and oral argument by *Mr. Ragatz.*

For the petitioners-appellants there was a brief by *Robert L. Gruber, Scott Herrick* and *Reynolds, Gruber,*

*Herrick, Flesch & Kasdorf,* Madison, and oral argument by *Robert L. Gruber.*

Amicus curiae brief was filed by *Frank Jablonski,* Madison, for Wisconsin's Environmental Decade, Inc.

Amicus curiae brief was filed by *John W. Calhoun,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general, and *Edward S. Alschuler,* of counsel, for the State Board of Vocational, Technical and Adult Education.

DAY, J.   This is a review of a decision of the court of appeals[1] reversing a judgment of the circuit court for Dane county, Honorable Robert R. Pekowsky, circuit judge. The circuit court summary judgment in favor of District No. 4 Board of Vocational, Technical and Adult Education (Board) in effect authorized the Board to proceed with its existing building program; discharged the plaintiffs' writ of mandamus to stop construction; and dismissed their petition for declaratory judgment. The issue on this review is: Does sec. 38.15, Stats. 1981–82, which requires voter approval by referendum of "building program actions approved by the [State VTAE] Board after January 31, 1980," apply to the Madison Area Technical College (MATC) project. We conclude that the MATC project was approved by the State Board within the meaning of the statute prior to the effective date of January 31, 1980, and is therefore exempt from the referendum requirement. We therefore reverse the decision of the court of appeals and reinstate the judgment of the trial court.

This case marks the latest step in a decade-long effort by the District 4 VTAE Board to build new facilities for the Madison Area Technical College. The Board's au-

---

[1] *Ball v. District No. 4, Bd. of Education,* 115 Wis. 2d 555, 341 N.W.2d 707 (Ct. App. 1983).

thority to construct new vocational, technical and adult education facilities derives from chapter 38 of the Wisconsin Statutes. That chapter establishes a statewide system of vocational, technical and adult education with overall responsibility for policy direction and administration of the VTAE system vested in a single State VTAE Board. Sec. 38.02, Stats. This statewide system is divided into sixteen regional vocational, technical and adult education districts. Each district is administered by a statutorily created District Board. Sec. 38.08. Among the powers granted to the District Boards is the power to borrow money and levy taxes to be used for the purchase, construction or enlargement of buildings and for the acquisition of sites and equipment. Sec. 38.16(2). District Board proposals for land acquisition, additional or new facilities and rental and remodeling of existing facilities must be approved by the State Board. Sec. 38.04(10).

In 1980, the legislature amended chapter 38 to require voter approval by referendum of certain capital expenditures by District Boards. 1979 Wis. Laws ch. 221. That provision, which is codified at sec. 38.15(1), Stats., states:

"**38.15 Financing of capital expenditures.** (1) Subject to sub. (3), if the district board intends to make a capital expenditure in excess of $500,000 for the acquisition of sites, purchase or construction of buildings, the lease/purchase of buildings if costs exceed $500,000 for the lifetime of the lease, building additions or enlargements or the purchase of fixed equipment relating to any such activity, it shall adopt a resolution stating its intention to do so and identifying the anticipated source of revenue for each project and shall submit the resolution to the electors of the district for approval. The referendum shall be noticed, called and conducted under s. 67.05 (6m) (b) to (e) insofar as applicable. For the purposes of this section, all projects located on a single campus site within one district which are bid concurrently or

which are approved by the board under s. 38.04(10) within a 2-year period shall be considered as one capital expenditure project."

Section 38.15(1), Stats. is expressly made subject to sec. 38.15(3). That subsection states:

"(3) This section applies to building program actions approved by the board after January 31, 1980. This section does not apply to capital expenditures in excess of $500,000 which are fully funded by gifts, grants or federal funds or to building remodeling or improvement projects."

The question presented by this case is: Did the State Board approve of the MATC project prior to January 31, 1980. If it did, the project is exempt from the referendum requirement of sec. 38.15(1).

The sequence of events in which the Board claims to find State Board approval of the MATC project began with a State Board meeting held on November 27, 1973. The minutes of that meeting reflect that the State Board's Facilities and Finance Committee had discussed location of a facility for District 4 and that the District Board had looked into a number of sites. The minutes state that the District Board was under pressure from various individuals to establish facilities separate from each other rather than an integrated campus. The Board was informed that the Facilities and Finance Committee had recommended to the State Board that it was interested in an integrated campus and requested a plan from them for developing such a campus. There was a question as to what was meant by an integrated campus and the response that it is a setting where students can move freely between educational activities. A motion was made and carried to notify District 4 that the State Board was interested in an integrated campus.

Over the next eight years there followed a number of State Board actions on District 4 Board proposals re-

garding the MATC facility. On October 15, 1974, the State Board met and approved a resolution from the District Board "regarding locating Madison Area Technical College at the East Washington Avenue site. . . ." On November 5, 1974, the district's voters passed a referendum authorizing the District Board to borrow up to $30 million to construct expanded facilities. The referendum sought voter approval to borrow the funds necessary for the new facility without specifying the location or layout of the campus. The referendum asked:

"Shall the Area Board of Vocational, Technical and Adult Education District No. 4 borrow the sum of not to exceed $30 million for the purchase or construction of buildings and additions, enlargements and improvements to buildings and for the acquisition of sites and equipment by issuing its general obligation promissory notes pursuant to S. 67.12 (12), Wis. Stats.?"

The voters passed the referendum. At its November 19, 1974 meeting the State Board noted that the District Board had successfully conducted a referendum obtaining voter approval of the bond issue and passed a motion to "go on the record commending District 4 on their efforts in getting the $30 million bond referendum passed."

On January 25, 1975, the State Board adopted a resolution approving the District Board's request to borrow $30 million for construction of the expanded facilities. The District Board proceeded to issue the necessary bonds. The East Washington Avenue site was abandoned after the Madison city attorney issued an opinion stating that the District Board lacked the condemnation authority necessary to procure the property for an East Washington Avenue campus.

The next State Board action on the MATC facility came on August 10, 1976. At that time the State Board approved a District Board proposal to locate the new

facility at Truax Field. The resolution adopted by the Board stated:

"NOW, THEREFORE BE IT RESOLVED, that the petition by the Madison area district board for approval of the Truax Field site be approved and that the district board be advised to proceed on the basis of that approval."

The Truax Field site was subsequently removed from consideration after a circuit court decision held that the District Board could not proceed with construction until it obtained a satisfactory environmental impact statement.

The next site proposed by the District Board was in the town of Burke. This proposal was heard and approved on November 21, 1978. This site was also abandoned following a circuit court ruling that construction of the campus could not proceed until a satisfactory environmental impact statement was obtained.

Finally, on October 16, 1981, subsequent to the effective date of section 38.15, Stats., the State Board adopted a resolution approving the District Board's proposal to locate the expanded MATC facilities at the existing North Carroll Street and Commercial Avenue sites and to construct new facilities at Truax. The State Board's resolution stated:

"WHEREAS, the District Director at the request of the Area Board of Vocational, Technical and Adult Education No. 4, pursuant to S. 38.04(10), Wisconsin Statutes, requests permission to site their expanded facilities at 211 North Carroll Street, the Technical Center at 2125 Commercial Avenue and the Truax Airpark, and. . .

"WHEREAS, the Area Board of Vocational, Technical and Adult Education No. 4 was granted permission by the Wisconsin Board of Vocational, Technical and Adult Education, pursuant to S. 38.04(10), Wisconsin Statutes on January 28, 1975, to borrow the funds approved by the

voters in a referendum held November 5, 1974, and to construct expanded facilities,

"NOW THEREFORE BE IT RESOLVED that the Area Board of Vocational, Technical and Adult Education No. 4 be granted permission to site their expanded facilities at 211 North Carroll Street and at the Technical Center, 2125 Commercial Avenue, and at the Truax Airpark, and

"BE IT FURTHER RESOLVED that the Area Board of Vocational, Technical and Adult Education No. 4 submit revised educational specifications for each of the three locations for State Board approval prior to commencing with detailed schematic planning."

This lawsuit was initiated by the plaintiffs on June 1, 1982, in their capacity as voters and taxpayers in the District 4 area. Their complaint alleged the applicability of section 38.15(1), Stats., to the MATC plan approved by the State Board on October 16, 1981. The complaint prayed for alternative relief in the form of a writ of mandamus to compel compliance with the statute or a declaratory judgment declaring the applicability of section 38.15.

The circuit court decided the case on the Board's motion for summary judgment on February 3, 1983. On the basis of the briefs and evidentiary documents submitted, the court determined that section 38.15, Stats., did not apply because the State Board had approved the plan to construct new MATC facilities prior to January 31, 1980.

The plaintiffs moved the circuit court for an order halting construction of the facilities pending appeal. That motion was denied.

The plaintiffs appealed the trial court's decision to the court of appeals. That court requested that this court bypass the court of appeals pursuant to section (Rule) 809.61, Stats. That request was denied.

On October 13, 1983, the court of appeals issued its decision reversing the trial court on the grounds that

section 38.15, Stats., applies to the MATC plan and that the requirements of that section had not been met. This court granted the Board's petition for review.

At issue in this court is what constitutes approval of a "building program action" under section 38.15 (3), Stats., and was such an approval of the MATC project given prior to January 31, 1980, so as to except that project from the requirements of the statute.

The plaintiffs' contention is that action on a building program is action on a specific project proposal which is definite as to cost, location and campus configuration. They argue that there was no State Board approval of the current MATC plan until October 16, 1981, and therefore the proposal must be submitted to the voters.

The Board argues that the plaintiffs misconstrue the essential character of section 38.15, Stats. The statute is not, the Board argues, intended to impose a requirement that district voters approve specifics such as the precise location or layout of a building project. Rather the statute requires approval by referendum of the general building plan and source of funding. The mere fact that the location of the MATC facility was not settled upon until after January 31, 1980, is not determinative. In order for the MATC project to be exempt from the referendum requirement there must have been an initial approval of an overall building plan prior to the effective date of the statute.

This case involves only the application of law to undisputed facts. This court must decide questions of law independently without deference to the decisions of the trial court and court of appeals. *First Nat. Leasing Corp. v. Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977).

There are a number of settled rules of statutory construction guiding our analysis of section 38.15, Stats. Principal among them is the rule that the purpose of

statutory interpretation is to ascertain and give effect to the intent of the legislature. *County of Columbia v. Bylewski,* 94 Wis. 2d 153, 164, 288 N.W.2d 129 (1980). In determining legislative intent, first resort must be to the language of the statute itself. If the meaning of the statute is clear on its face, this court will not look outside the statute in applying it. *Wis. Elec. Power Co. v. Public Service Comm.,* 110 Wis. 2d 530, 534, 329 N.W.2d 178 (1983). If the language of the statute is ambiguous or unclear, this court will endeavor to ascertain the intent of the legislature as disclosed by the scope, history, context, subject matter and object of the statute. *Midland Fin. Corp. v. Department of Rev.,* 116 Wis. 2d 40, 46, 341 N.W.2d 397 (1983).

The plaintiffs' first argument for reading "building program" to mean a specific plan including location and type of campus is that the words themselves are capable of no other meaning. They argue that a general plan to build which is not definite as to location cannot be a building program. We do not understand the word program in so definite a sense. Webster's Third New International Dictionary defines "program" as "a plan of procedure: a schedule or system under which action may be taken toward a desired goal: a proposed project or scheme." None of these definitions suggests that there must be some necessary minimum of detail in order to qualify as a "program." Moreover, there is no sound basis for classifying a building plan as a "program" on the basis of its having a definite site and campus structure rather than, for example, on the basis of a definite architectural design or brick color. The term "building program action," standing alone, is unclear. It may reasonably be understood as signifying a general plan to build a new campus or a specific plan to build a particular structure on a particular site.

The plaintiffs next argue that even if the meaning of the phrase is not clear on its face, it is clear when read in the context of the entire section. They argue that the phrase building program action used in section 38.15(3), Stats., is synonymous with the phrase "capital expenditure" or "capital expenditure project" used in section 38.15(1).

It would be expected, however, that had the legislature intended to make section 38.15(1), Stats., applicable to capital expenditure projects approved after January 31, 1980, it would have said so. The plaintiffs explain the legislature's introduction of the term "building program action" by arguing that repetition of the phrase "capital expenditure project" in section 38.15(3), would have been "awkward" and that the alternative expression was chosen in the interest of "smoother English." We find this explanation unsatisfactory. It is not reasonable to presume that the legislature preferred elegance over precision in its wording of the statute. The more reasonable presumption is that the legislature chose its terms carefully and precisely to express its meaning.

More importantly, it is not apparent what if any significance there would be in establishing the equivalence of the two terms. The plaintiffs argue that a capital expenditure project is a project with a known site and construction plan and that it is this that the voters must approve. That is not, however, what section 38.15(1), Stats., requires. It requires rather that if the District Board determines to make a capital expenditure in excess of $500,000 for any of a number of stated purposes, it must adopt a resolution stating its intention to do so, identifying the anticipated source of revenue, and submit that resolution to the voters for approval. The language of the statute is inconclusive as to precisely what the voters must approve—whether it is the Board's intention to make an expenditure in excess of $500,000 and the

source of funding or the particulars of the project under consideration. Even if "building program" is deemed synonymous with "capital expenditure project," it does not follow that the statute requires voter approval of specifics such as location and campus layout.

Finally, the plaintiffs argue that when section 38.15, Stats., is read in the context of the entire chapter the meaning of "building program actions approved" becomes evident. They point out that the only formal mechanism for State Board approval of District Board proposals is under section 38.04(10),[2] and conclude that the approval referred to in section 38.15(3), must be that which the State Board is authorized to give under section 38.04(10). This conclusion is bolstered, it is argued, by the specific mention of section 38.04(10) in section 38.15(1). Since section 38.04(10) does not provide for the sort of general concept approval argued for by the Board, there could not have been approval of the MATC project prior to the specific approval given on October 16, 1981.

This argument has the same flaw as the plaintiffs' argument equating building program with capital expenditure; if the legislature intended to make the referendum requirement applicable to actions approved under section 38.04(10), Stats., there is no accounting for its failure to say so expressly. Furthermore, the reference to section 38.04(10) in section 38.15(1), is for the purpose of defining as one capital expenditure "all projects on a single

[2] "38.04 **Board of vocational, technical and adult education; powers and duties.** . . . (10) ADDITIONAL FACILITIES. The board shall review and approve any proposals by district boards for land acquisition, additional or new facilities, rentals and remodeling of existing facilities, prior to the letting of contracts to construct, remodel, rent or incur debt for such facilities or acquisition of land. The board shall encourage district boards to finance capital building proposals with long term benefits through bonding or promissory note obligations."

campus site within one district which are bid concurrently or which are approved by the board under section 38.04(10), Stats. within a two year period." It is not used to define what it is the voters must approve. The mention of section 38.04(10) in section 38.15(1) proves, if anything, that the drafters were aware of the provision and strongly suggests that they would have made reference to it in section 38.15(3) had that been their intent.

It is true that there is no expressly defined statutory mechanism for the State Board to approve a District Board's general plans to go ahead with a building program. Although not expressly mentioned, such authority is reasonably implied in the State Board's general powers to "determine the organization, plans scope and development of vocational, technical and adult education" under section 38.04(1), Stats. It is certainly reasonable to construe this section as vesting in the State Board authority to approve a general plan to construct new educational facilities and thereby authorize the District Board to proceed to the next step of obtaining voter approval of the plan and source of funding and developing the particulars of the project to be submitted to the State Board for approval under section 38.04(10).

The Board argues that the legislature intentionally phrased the applicability provision in terms of "building program actions" rather than section 38.04(10), Stats., approvals in order to make it clear that what the statute requires is voter approval of a general plan for the construction of new facilities. In support of its position, the Board argues that adopting the plaintiffs' interpretation of the statute would yield an absurd and unworkable result.

First, it is argued that the interpretation urged by the plaintiffs would render section 38.04(10), Stats., superfluous by creating an identical final approval requirement under section 38.15(3). This is not so. Requiring

referendum approval of all matters approved by the State Board under section 38.04(10), would not negate the significance of State Board approval but would simply impose a two-step approval process. Under the plaintiffs interpretation, matters submitted to and approved by the State Board would also have to be submitted to the voters.

More to the point is the Board's argument that to require the electorate to approve the particulars of a project which are submitted for State Board approval under section 38.04(10), Stats., would render the process so unwieldy as to be unworkable. Plaintiffs interpretation could result in a single project requiring multiple approvals under section 38.15(3). A more reasonable interpretation of the entire legislative scheme contained in chapter 38 is to require referendum approval of a general building plan and the source of funding for that plan. Approval of the details of implementation of the plan is then left to the State Board.

The Board contends that the State Board approved a general plan to build a new MATC facility in its meeting of November 27, 1973. The minutes from that meeting state that the State Board's Facilities and Finance Committee had discussed location of a facility for District 4 and recommended that the State Board inform the District Board that it is interested in an integrated campus and request a plan for developing such a campus. In conformity with the committee's recommendation, the Board voted "to notify District 4 that the State Board is interested in an integrated campus."

This action, while not expressly stating approval of a District Board request, can only be understood as an authorization to the District Board to go ahead with the development of particular plans for an MATC facility and an invitation to the District Board to submit those plans for State Board approval. The subsequent actions of both

the State and District 4 Boards bear out the view that the District had received a go ahead to proceed on the MATC project. The State Board actions in 1974, 1976, 1978 and 1981 were all approvals of District Board proposals to build the facility on a particular site. The clear implication is that approval to build a new campus somewhere had already been given.

The Board also proffers a number of items of legislative history which are said to support its position that the legislature intended to except the MATC facility from the requirements of section 38.15, Stats. The plaintiffs object to this court's consideration of some of those documents as unreliable.

The first item of legislative history offered for our consideration is a report prepared by Bob Lang, Director of the Legislative Fiscal Bureau, for the Elementary and Secondary Education Discussion Group of the Joint Committee on Finance. This report, which is dated February 21, 1980, addresses the question of public approval of capital expenditures by vocational, technical and adult education districts and concludes by recommending five alternative amendments to the existing statutory scheme to increase District Board accountability. This is an official report of a legislatively created committee and as such is clearly valid evidence of legislative intent. *In re Estate of Haese,* 80 Wis. 2d 285, 297, 259 N.W.2d 54 (1977).

The second item is a memorandum from Dr. Robert P. Sorensen, Director of the State VTAE Board, to Representative Ronald Lingren. The subject of the memorandum, which is dated March 3, 1980, is "suggested changes to Joint Finance Motion of February 28, 1980— Referendum Limitation on VTAE Capital Construction."

The plaintiffs challenged the use of this document in the trial court and that challenge was denied by Judge Pekowsky. The court of appeals did not reach the ques-

tion of its reliability. We agree with Judge Pekowsky's conclusion.

In support of its position that the Sorensen memorandum should be excluded from consideration, the plaintiffs cite *State v. Consolidated Freightways Corp.*, 72 Wis. 2d 727, 738, 242 N.W.2d 192 (1976) and *Wisconsin Southern Gas Co. v. Public Serv. Comm.*, 57 Wis. 2d 643, 652, 205 N.W.2d 403 (1973) for the proposition that neither a legislator nor a private citizen is permitted to testify as to what the intent of the legislature was in the passage of a particular statute. This statement, though accurate, has no bearing on the Sorensen memorandum. Were Dr. Sorensen to testify as to his views on the applicability of section 38.15 to the MATC facility, that testimony would have to be discounted as unreliable. However, it is not Dr. Sorensen's views of what the legislature intended that the Board seeks to have considered. At issue is a contemporaneous document from the head of a state agency submitted to a legislative committee advising the committee on the inclusion of an applicability provision using the very language later incorporated into the statute.

The plaintiffs also argue that the courts should not permit the search for legislative intent to extend beyond the official reports of legislatively created advisory committees. Our cases, however, have not defined the extent of reliable evidence of legislative intent so narrowly. Under some circumstances this court has considered evidence of legislative intent from non-legislative committees and other sources. *See e.g., In re Estate of Haese*, 80 Wis. 2d at 297; *Nekoosa-Edwards Paper Co. v. Public Serv. Comm.*, 8 Wis. 2d 582, 591, 99 N.W.2d 821 (1959).

Ordinarily statements from nonlegislative sources do not carry as much probative value as official statements.

2A Sutherland *Statutory Construction*, section 48.11 (1973). Therefore, such aids should be used cautiously. When, however, a contemporaneous report or other document from a nonlegislative agency or even a private party forms a vital link in the chain of legislative history of a particular statute, such unofficial report or other document may be used to determine the legislative intent behind the statute. G. Folsom, *Legislative History*, p. 31–32 (1972).

The Board also offers the affidavit of Judith Ward, program supervisor for the Legislative Fiscal Bureau. The plaintiffs raise the same objections to this document as were raised regarding use of the Sorensen memorandum.

Were the Board to present the affidavit as tending to show the legislature's intent in enacting section 38.15, Stats., it would be clearly unreliable. It is, however, reliable for the limited purpose for which it is offered, that is, to provide a chronology of events surrounding the passage of section 38.15. Therefore consideration of the document by this court is proper.

The evidence from these three documents reveals that consideration of an amendment to section 38.15, Stats., requiring voter approval of District Board expenditures began with the submission of the Lang report in February of 1980. Shortly thereafter, the Elementary and Secondary Education Discussion Group of the Joint Committee on Finance requested the Legislative Fiscal Bureau to draft a motion to amend the statutes to require greater public accountability for expenditures by district VTAE boards. A motion was drafted and submitted to the Joint Finance Committee for consideration. This first motion, which contained no effective date or exemption provision, was tabled without action and referred back to the discussion group.

On March 3, 1980, Dr. Sorensen submitted his memorandum to the discussion group. That memorandum contained a number of suggestions including a suggestion that the statute be amended to state that "[a]ll building program actions approved by the State Board on or before January 31, 1980 shall not be subject to the referendum requirement. . . ." Attached to the memorandum was a list labeled: "Projects Approved by State Board and/or Pending Approval Nearing Construction Stage (January 31, 1980)." Under the heading "AREA FOUR —MADISON" was the notation: "Voters approved referendum in November, 1974 for a new campus."

The Legislative Fiscal Bureau subsequently drafted a second motion which was approved and reported out of the Joint Finance Committee on March 7, 1980. This motion recommended that "all building program actions approved by the State Board on or before January 31, 1980, shall not be subject to the requirements included under this motion." A first draft of the proposed statute was prepared by the Legislative Fiscal Bureau in conformity with the approved second motion. This draft was sent to the Legislative Reference Bureau where the statute was given its present form.

The plaintiffs argue that this evidence of legislative intent, if allowed, supports their contention that section 38.15(3), Stats., approval is identical with approval under section 38.04(10). In reference to the Lang report, they state: "In detail this document continually discusses State Board approval as that which is granted under 38.04(10)" and that "[t]he building programs to be approved are those construction projects upon which 'a resolution by the district Board' has been made and a request for approval by the state Board has been made."

The report does discuss State Board approval of District Board proposals. The State Board's Policy Announcement 79–13 which outlines procedures for State

Board approval is attached to the report. However, the report nowhere states that matters which must be submitted for State Board approval also should be submitted to the voters. At one point the report notes that a project must receive State Board staff approval "at various stages of the project's development" of matters as minute as the project schematic design, building materials, maintenance requirements, and building contract documents. It cannot seriously be argued that because these matters are subject to State Board review under section 38.04 (10), Stats., they should also be placed before the voters.

As to the Sorensen memorandum, the plaintiffs argue that the attachment lists both approved projects and projects for which approval was pending on January 31, 1980. They further argue that the statement regarding referendum approval of the MATC facility suggests that State Board approval was still pending.

The fact that the heading to the attachment—"Projects Approved by State Board and/or Pending Approval Nearing Construction Stage"—contains both the disjunctive "or" and the conjunctive "and" demonstrates that there were some projects which had received State Board approval *and* were pending approval nearing construction stage. These are evidently projects which have received some form of initial approval and were awaiting additional approvals before beginning construction. This is precisely the status of the MATC project at the time of passage of the statute.

Under the heading AREA FOUR—MADISON was a statement that there had been a referendum approval of a "new campus" in 1974. This statement is consistent with the view that there was a prior approval of a general building plan for MATC. It is not consistent with the view that the only approvals were approvals of specific sites.

We conclude that the chronology of events leading up to the passage of the statute—the initial Finance Committee motion containing no effective date, the submission of the Sorensen memorandum, and the second motion containing the applicability provision—together with the similarity in wording between the Sorensen memorandum and both the finance committee motion and the final statute strongly suggests that the memorandum was the source of the exemption provision. The inclusion of the District 4 project on a list attached to the memorandum further suggests that the legislature intended to exempt that project from the requirements of section 38.15, Stats.

Based on all the evidence including the wording of the statute, the relationship of section 38.15, Stats., to the rest of chapter 38, and the legislative history of the provision, we conclude there was an approval of the MATC project prior to January 31, 1980, exempting it from the requirements of section 38.15 (1). The evident purpose of including section 38.15 (3), providing an effective date for the referendum requirement is to permit projects which had already been approved to go ahead without having to be ratified by the voters. The fact that the limitation provision is stated in terms of inclusion rather than exclusion is not significant. Furthermore, if the project had been approved prior to January 31, 1980, the fact that the State Board may have taken additional action on the project after that date does not trigger the application of the referendum requirement.

The legislature's choice of the broad generic term "building program actions" demonstrates that the legislature intended that the exemption provision be construed expansively rather than restrictively. An interpretation

of the statute which requires referendum approval of District Board decisions to spend public money to provide for vocational, technical and adult education needs in the district and which leaves the approval of project specifics such as site and campus layout to the State Board under section 38.04(10), Stats., comports with the general scheme established by chapter 38. The whole course of events from the 1973 State Board meeting through the October, 1981 meeting in which the State Board approved the current site evidences the existence of a single building program. The only thing in dispute during this period was where the new facility would be located. Finally, the legislative history of section 38.15, demonstrates that the legislature recognized that there was an approved plan to build a new MATC facility and intended to except that project from the referendum requirement.

We therefore conclude that the MATC building program was approved prior to January 31, 1980, and is exempt from the referendum requirement of section 38.15(1), Stats.

*By the Court.*—The decision of the court of appeals is reversed.

ABRAHAMSON, J., took no part.

WILLIAM A. BABLITCH, J. (dissenting). A unanimous court of appeals concluded that the referendum requirements of sec. 38.15, Stats., apply to District No. 4's current plan for a split campus for the new MATC facilities, and that the requirements of that statute have not been met. I agree with that conclusion.

The court of appeals' decision very importantly serves to carry out the legislature's intention in passing that law. As noted by the majority of this court, a cardinal

rule of statutory construction is that the purpose of statutory interpretation is to ascertain and give effect to the intent of the legislature. *County of Columbia v. Bylewski*, 94 Wis. 2d 153, 164, 288 N.W.2d 129 (1980).

To understand the legislative intent, and why the court of appeals' decision is correct, it is important to understand the background surrounding the passage of this law. The members of the State VTAE Board as well as the district VTAE boards are all appointed. They are elected by no one. In addition, the district boards have the power to tax.

The record clearly reveals the frustrations of the legislature in attempting to force greater public accountability on the VTAE system. The 1977–79 biennial budget included a provision requiring district VTAE boards to seek public approval through the referendum process of all capital expenditure projects in excess of $500,000. Specifically, sec. 67.05(6m)(a), Stats., was amended to provide in pertinent part: ". . . All resolutions adopted under sub. (1) in an amount of money in excess of $500,000 or more for purposes specified in s. 38.16(2) shall be submitted to the electors of the district for approval. . . ." From July 1, 1977, when this mandatory referendum process became effective, through June 30, 1979, eight new construction and remodeling projects with estimated costs exceeding $500,000 were approved by the State Board. Despite the mandatory referendum requirement, only one of those projects was submitted to the voters for approval. All remaining seven projects avoided the referendum process by structuring their financing plans so that mandatory referenda were not required. The one project of the eight that was submitted for referendum approval failed to receive voter approval. Nevertheless, that project went ahead because after the referendum failed, the State Board authorized the local

district to structure their financing plans so as to avoid the need for a referendum.

In a memo dated February 21, 1980, from Robert Lang, Director of the Legislative Fiscal Bureau, to the Joint Committee on Finance, which drafted the language of sec. 38.15, Stats., Lang advised the Committee:

"In summary, it would appear that since July 1, 1977, vocational districts have been structuring their capital project financing plans so that mandatory referenda are not required. Presumably the districts wish to avoid the possibility of public rejection of proposed capital project expenditures . . . If mandatory referenda seems the most direct was to insure accountability, the statutes could be amended to require all building and remodeling projects with costs in excess of $500,000 . . . to be subjected to elector approval. . . ."

The end result was passage in 1980 of sec. 38.15. The legislature, having tried but failed in the past, was determined to force public accountability on the State Board.

It is conceded by all parties that the legislative intent of sec. 38.15, Stats., was to make those boards more accountable to the taxpaying public by providing that building program actions approved by the State Board that cost in excess of $500,000 would be subject to voter approval by referendum.

The purpose of sec. 38.15, Stats., is obvious: to give the public the opportunity to debate and decide by way of referendum the kinds of costly proposed building program actions enunciated in sec. 38.15(1) involving either a) an acquisition of a site; or b) purchase or construction of buildings; or c) lease/purchase of buildings; or d) building additions or enlargements; or e) the purchase of fixed equipment relating to the above activities. The proposed MATC split campus project involves several of these.

In 1974, the voters approved borrowing for a project that was far different from the project in this case with respect to: scope, cost, integrated vs. split, new construction vs. rehabilitation and construction, and effect on students, on the area, and on the electors of the district.[1] The environmental, social, and economic questions involving this split site campus are far different, far more complex, and far more reaching than the 1974 approved project. Public consciousness and public attitudes regarding urban sprawl, urban decay, and downtown development are much different today than in 1974. The purpose of the statute enacted in 1980 was obviously to provide the public with the opportunity to debate and decide these types of questions. They merit debate. The decision of the majority forecloses that opportunity. I conclude that sec. 38.15, Stats., must be interpreted in a way that most fully effectuates the legislative intent of providing that public debate and decision. I therefore dissent.[2]

---

[1] The evidence in this record concerning whether the legislature intended to exempt any building project of District No. 4 from the referendum requirements is decidedly mixed. I note, however, that at the time the legislature passed sec. 38.15, Stats., in 1980, the only project of District No. 4 that had received State Board approval *and* that had not been struck down by court action was the single site project at East Washington Ave. One can only speculate what action the legislature would have taken had it known about the proposed split campus plan.

[2] This project has already been delayed more than ten years. Another few months to allow a referendum does not appear onerous or unreasonable. A fear by District No. 4 that the district voters may defeat the project in a referendum is certainly understandable; however, that possibility is in the very nature of the democratic process.