In re the Marriage of:

Tina L. Stevenson, n/k/a Tina L. Cook,
Petitioner-Respondent,

v.

Jeffery B. Stevenson, Respondent-Appellant.

Court of Appeals

*No. 2007AP2143. Submitted on briefs June 12, 2008.
—Decided February 4, 2009.*

2009 WI App 29

(Also reported in 765 N.W.2d 811.)

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Daniel M. Muza* of *Reff, Baivier, Bermingham & Lim, S.C.*, Oshkosh.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Patrick G. Seubert* of *Seubert & Huber, LLP*, Neenah.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. ANDERSON, P.J. Jeffery B. Stevenson played a game of "cat and mouse" with the court for nine years. He has finally been caught. Jeffery argues that he did not fail to make the required financial disclosure at the time of his divorce from Tina L. Stevenson (n/k/a Tina L. Cook). We disagree. Jeffery claims that the trial court's retroactive adjustment to his child support obligation was not warranted. We disagree. In the alternative, Jeffery argues that if any child support adjustment is justified, it should be limited to the years 1997, 1998 and 1999 because full disclosure of all his income tax returns from the year 2000 forward had been made and increased support has been set as a result of that disclosure. Again, we disagree. We affirm the judgment of the trial court.

¶ 2. Jeffery and Tina married in October 1992. They had one child born in March 1995. A petition for divorce was filed on August 12, 1996. Both parties proceeded pro se. Before their divorce, they each filed financial disclosure statements as required by Wis. Stat. § 767.27(1) (1995–96).[1] Tina reported on her financial disclosure statement that she was a hair stylist earning $766 per month. Jeffery reported on his that he was a self-employed carpenter earning $3000/3200 per month and listed as assets his residence, his car and his bank accounts. Attached to Jeffery's financial disclosure statement were two checks issued to Jeffery from State Street Bank, one for $1600 and one for $1400; nowhere in the disclosure statement

_____

[1] Wisconsin Stat. § 767.27 (1995–96) was renumbered and amended by 2005 Wis. Act 443, §§ 68, 121 and 123, and is now WIS. STAT. § 767.127 (2005–06). None of the changes to the statute are relevant here.

All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

did it indicate where the money for these checks came from. No place in his disclosure statement did Jeffery report his trust interests. In the marital settlement agreement, Jeffery agreed to make child support payments in the amount of $512 per month. Based on this information, the judgment of divorce was granted on January 21, 1997.

¶ 3. Jeffery is an heir to the Dow Jones fortune through his grandmother, Jane B. Cook.[2] It is undisputed that although Jeffery did not report to the trial court that he had interest in any trusts on the date that the parties' divorce was granted, Jeffery was the beneficiary of four trusts:  the Jane B. Cook 1968 Trust, valued at approximately $1,323,310; the Stevenson Children's 1969 Trust, valued at approximately $489,276; the Jeffery B. Stevenson 1990 Trust, valued at approximately $749,076; and the Jeffery B. Stevenson 1976 Trust—the January 1997 value of which is unclear from the record; however, the September 2006 value was approximately $1.5 million. Of the four trusts, the Jane B. Cook 1968 Trust, the Stevenson Children's 1969 Trust and the Jeffery B. Stevenson 1976 Trust were created by others. Jeffery's interest in these three trusts was as an income beneficiary. The distributions from these trusts to Jeffery were solely at the discretion of the trustee. The Jeffery B. Stevenson 1990 Trust was created by Jeffery when he turned twenty-one years old.

¶ 4. On November 24, 2003, Tina filed a request for production of documents based on her contention that a substantial change of circumstances existed

---

[2] Jeffery's now deceased grandmother, Jane B. Cook, is a member of the Bancroft family, the controlling shareholder of Dow Jones & Company before the company was acquired in 2007 by News Corporation.

warranting an increase in the amount of child support that Jeffery should pay. After repeated requests that Jeffery comply, all to no avail, Tina filed a motion to compel discovery and increase child support on January 21, 2004. The court granted Tina's motion to compel discovery and reserved its jurisdiction for the child support determination. After being court ordered, Jeffery finally produced his income tax returns for the years 2000 to 2003. In February 2007, by stipulation of the parties, the court approved an order increasing child support to $5500 per month, retroactively effective March 15, 2006.

¶ 5.  In May 2006, prior to the February 2007 order increasing child support, Tina had filed a motion to reopen the judgment of divorce pursuant to Wis. Stat. § 767.27(5) (1995–96), claiming that Jeffery deliberately failed to disclose his income and assets during the divorce proceedings. A bench trial was held on May 4, 2007, and oral arguments took place on July 13, 2007.

¶ 6.  At trial, the following exchange took place between Jeffery and Tina's counsel:

[Counsel] Now, you're indicating in this document that you had income of $3,200. What was that?

[Jeffery] That was my income.

[Counsel] What was the income from?

[Jeffery] From whatever trust it could have came from.

. . . .

[Counsel] But you didn't indicate . . . where in fact it came from; is that correct?

[Jeffery] It didn't ask that.

447

[Counsel] But you didn't indicate that . . .?

[Jeffery] No.

¶ 7. Jeffery then confirmed that his financial statement indicated that he was a "self-employed carpenter" but that at the time he claimed this occupation, he was not doing work for anyone other than himself and did not receive income for this work:

[Counsel] [I]t indicates that you were a self-employed carpenter; is that correct?

[Jeffery] Yes.

[Counsel] How frequently were you working as a carpenter in 1996 and 1997?

[Jeffery] I was working for myself on my own house.

[Counsel] Were you receiving any income from that?

[Jeffery] No.

¶ 8. At trial, Jeffery acknowledged that although his 1996 tax return showed that his annual taxable earnings were $115,730, he was paying child support based on an income of $3000 to $3200 per month or approximate annual earnings of $38,400 per year. Specifically, he was paying the court ordered $512 per month or $6144 per year as child support. He also acknowledged that he had not reported any business income attributable to his self-employed carpenter status.

¶ 9. Jeffery confirmed that in his financial disclosure statement, he did not disclose the existence of the trusts or his trust interests. He further confirmed that in the marital settlement agreement, he did not indi-

cate the existence of the trusts; moreover, he did not indicate that he was a beneficiary of four trusts. Jeffery offered this explanation for why he did not disclose the trust information to the trial court before it entered its judgment of divorce: "I didn't know anything about it but what I was getting . . . . It was up to other people. I had no control of it."

¶ 10. At trial, Jeffery confirmed his current net worth to be approximately $17 million. Specifically, he confirmed: that he established a fifth trust in 1999 and it is valued at approximately $10 million with an estimated annual income of $267,000; that the Jeffery Stevenson 1990 Trust is still in effect and is valued at approximately $95,000 with an estimated annual income of $3200; that the Stevenson Children's Trust is still in effect and is valued at $658,000 with an estimated annual income of $14,900; that the Stevenson 1976 Trust is still in effect and is valued at $1.5 million with an estimated annual income of $32,190; and that the Jane B. Cook 1968 Trust is still in effect and is valued at approximately $1.7 million with an estimated annual income of $41,000. Jeffery confirmed his other assets as well: vehicles with a total value of approximately $275,000; a $3.3 million home in Key Largo; other real estate valued at approximately $600,000.

¶ 11. Jeffery testified that he first "found out about" the trusts in 1994 or 1995 when he was approximately twenty-five years old. However, on cross-examination, he admitted that he began receiving distributions when he started college, which was when he was approximately nineteen or twenty years old.

[Counsel] But you were receiving distributions all the way back to when you were approximately 19 or 20?

[Jeffery] Right, when I started college.

[Counsel] Okay. So you were aware there was certainly something set up for your benefit at that time?

[Jeffery] I guess so.

[Counsel] And when you would speak with Mr. Elefante, it was in regards to these trusts; would that be accurate?

[Jeffery] Well, when are you talking about?

[Counsel] Well, he indicated he started meeting you in the early part of the '90s here when you met with him or spoke with him.

. . . .

[Jeffery] I never had met Mike Elefante until 1995.

[Counsel] Well, his testimony differs, but whenever you're saying that you met him, the discussion was about the trusts, correct?

[Jeffery] Yes.

[Counsel] And you knew they existed?

[Jeffery] Yes.

[Counsel] And you knew that you were a beneficiary of them?

[Jeffery] Not entirely. I didn't really know about most of the trusts at all.

[Counsel] Well, wait a minute, Mr. Stevenson. You knew you were getting money from these trusts, right? Now, you're going to step in front of the Judge today and say that you didn't know where this money was coming from?

[Jeffery] Yes.

450

[Counsel] You had no idea where that money came from?

[Jeffery] When I went to college, my dad said you can get some money. I had absolutely no idea where it was from, who it was from or what amounts. That's all I knew about that.

. . . .

[Counsel] And do you recall in 1990, when you established your trust, you had to sign some documents in regards to that, the 1990 Jeffery Stevenson Trust?

[Jeffery] Yeah, my parents had me sign something. I had no idea what it was.

[Counsel] Okay. But you did sign documents in 1990 establishing the 1990 Jeffery Stevenson Trust; is that correct?

[Jeffery] Look, I didn't know what it was.

¶ 12. Later, on cross-examination, Jeffery changed his story yet again. Having first testified that he did not learn about the trusts until 1994 or 1995 and later admitting that he became aware of them in 1990 because he was actually receiving distributions in 1990, he then returned to his claim that he was not aware that he was a trust beneficiary until 1995 when he claims he first met trustee Mike Elefante:

[Jeffery] When my grandmother died, I got a letter saying I got some money and we went to go find out what it was about.

[Counsel] Then you went out there and you found that you were a beneficiary on these trusts; is that correct?

[Jeffery] Yes.

451

. . . .

[Counsel] [Mr. Elefante] was trustee?

[Jeffery] Yes.

[Counsel] You knew [Mr. Elefante] was trustee?

[Jeffery] I didn't know. All I got was his name so I went to the meeting to find out what it was about.

[Counsel] Well, these trusts are listed on your tax returns. You signed your tax returns, right?

[Jeffery] Yes.

[Counsel] So you knew they existed, correct?

[Jeffery] I guess so, yeah.

[Counsel] No. You knew they existed, correct?

[Jeffery] Yeah.

[Counsel] And you knew you were receiving money from them, correct?

[Jeffery] Yes.

Jeffery's testimony continued in this contradictory style. The court also heard testimony from Tina and the trustee Mike Elefante whose pertinent portions of testimony we touch on below.

¶ 13.  At the close of trial, the court found that Jeffery either willfully or negligently failed to disclose all of the assets that he had at the time of divorce and that had Jeffery fully disclosed his assets, the court would have set child support at a different level. It granted Tina's motion to reopen the judgment of divorce to adjust the child support determination. It

452

ordered Jeffery to pay $159,532 as retroactive child support from 1997 through 2003, including twelve percent interest commencing from May 16, 2006—the filing date of Tina's motion to reopen—and continuing until such time as the judgment is satisfied in full. In addition, it ordered Jeffery to pay Tina's attorney fees in the amount of 15,630.92. Jeffery appeals.

■

¶ 14. We will not set aside the factual findings of the trial court unless they are clearly erroneous. WIS. STAT. § 805.17(2). While acting as the finder of fact, the trial court is the ultimate arbiter of the credibility of witnesses. *Gehr v. City of Sheboygan*, 81 Wis. 2d 117, 122, 260 N.W.2d 30 (1977). When evidence supports the drawing of either of two conflicting but reasonable inferences, the trial court, and not this court, must decide which inference to draw. *See Onalaska Elec. Heating, Inc. v. Schaller*, 94 Wis. 2d 493, 501, 288 N.W.2d 829 (1980).

¶ 15. WISCONSIN STAT. § 767.27 (1995–96), after requiring in subsection (1) that parties to a divorce proceeding fully disclose all "assets" which are to include but "not be limited to, real estate, savings accounts, stocks and bonds, mortgages and notes, life insurance, interest in a partnership, limited liability company or corporation, tangible personal property, income from employment, future interests whether vested or nonvested, and any other financial interest or source" provides at subsec. (5):

> If any party deliberately or negligently fails to disclose information required by sub. (1) and in consequence thereof any asset or assets with a fair market value of $500 or more is omitted from the final distribution of property, the party aggrieved by such nondisclosure may at any time petition the court granting the

annulment, divorce or legal separation to declare the creation of a constructive trust as to all undisclosed assets, for the benefit of the parties and their minor or dependent children, if any, with the party in whose name the assets are held declared the constructive trustee, said trust to include such terms and conditions as the court may determine. The court shall grant the petition upon a finding of a failure to disclose such assets as required under sub. (1).

¶ 16.  When reviewing child support calculations, we must interpret and apply the relevant administrative rule. WISCONSIN ADMIN. CODE § DWD 40.02(13)(a) defines gross income as it pertains to child support calculations as follows:[3]

"Gross income" means all of the following:

1. Salary and wages.

2. Interest and investment income.

3. Social Security disability and old-age insurance benefits under 42 USC 401 to 433.

4. Net proceeds resulting from worker's compensation or other personal injury awards intended to replace income.

5. Unemployment insurance.

6. Income continuation benefits.

---

[3] WISCONSIN ADMIN. CODE ch. HSS 80 was renumbered chapter WIS. ADMIN. CODE ch. DWD 40 by emergency rule effective October 1, 1998. Chapter HSS 80 as it existed on July 31, 1999, was renumbered ch. DWD 40, Register, July, 1999, No. 523, eff. 8–1-99. Ch. DWD 40 note (2008). The current ch. DWD 40 is applicable because the trial court reopened the divorce in 2007. We note that in reviewing the administrative code's ch. HSS 80 as it existed in 1997, we would reach the same result.

7. Voluntary deferred compensation, employee contributions to any employee benefit plan or profit-sharing, and voluntary employee contributions to any pension or retirement account whether or not the account provides for tax deferral or avoidance.

8. Military allowances and veterans benefits.

9. Undistributed income of a corporation, including a closely-held corporation, or any partnership, including a limited or limited liability partnership, in which the parent has an ownership interest sufficient to individually exercise control or to access the earnings of the business, unless the income included is an asset under s. DWD 40.03 (4). In this paragraph:

a. "Undistributed income" means federal taxable income of the closely held corporation, partnership, or other entity plus depreciation claimed on the entity's federal income tax return less a reasonable allowance for economic depreciation.

b. A "reasonable allowance for economic depreciation" means the amount of depreciation on assets computed using the straight line method and useful lives as determined under federal income tax laws and regulations.

Note: Income considered under this subsection is subject to the adjustments under s. DWD 40.03 (2).

10. All other income, whether taxable or not, except that gross income does not include any of the following:

a. Child support.

b. Foster care payments under s. 48.62, Stats.

c. Kinship care payments under s. 48.57(3m) or (3n), Stats.

455

d. Public assistance benefits under ch. 49, Stats., except that child care subsidy payments under s. 49.155, Stats., shall be considered income to a child care provider.

e. Food stamps under 7 USC 2011 to 2036.

f. Cash benefits paid by counties under s. 59.53 (21), Stats.

g. Supplemental Security Income under 42 USC 1381 to 1383f and state supplemental payments under s. 49.77, Stats.

h. Payments made for social services or any other public assistance benefits.

(b) This subsection defines gross income used in establishing a child support order under this chapter and may not be used to limit income withholding under s. 767.75, Stats., or the assignment of worker's compensation benefits for child support under s. 102.27 (2), Stats.

Note: This paragraph clarifies that although the portion of worker's compensation awards not intended to replace income is excluded from gross income in *establishing* a child support order, the full worker's compensation benefit is assignable for the *collection* of child support.

¶ 17. The interpretation and application of an administrative rule to undisputed facts is a question of law, which we review without deference to the lower courts. *Ball v. District No. 4, Area Bd.*, 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984); *Basinas v. State*, 104 Wis. 2d 539, 546, 312 N.W.2d 483 (1981) (construction of administrative rules is governed by same principles that apply to statutes).

456

¶ 18. On appeal, we examine whether undistributed income from a valid nongrantor trust[4] should be used in calculating child support under WIS. ADMIN. CODE ch. DWD 40, to the extent that the parent who is obligated to pay child support is individually taxed on the income of the trust. Jeffery argues that undistributed trust income should not be used in child support obligation calculations and that his nondisclosure of the trust income was not improper. He argues that the trial court's order of retroactive child support was error. In the alternative, he argues that if a child support adjustment is warranted, it should be limited to the years 1997, 1998 and 1999 because full disclosure of all income tax returns from the year 2000 forward has been made and support set as a result of that disclosure. Jeffery's arguments fail and we affirm the trial court for the reasons we discuss.

¶ 19. The portions of the transcript we have related give the flavor of Jeffery's testimony as a whole—a testimony that was, as characterized by the trial court "to put it nicely, incredible . . . at times misleading and certainly self-serving." Not only did Jeffery himself give conflicting testimony, his testimony was contradicted several times throughout the trial by others. The trial court adjudged the credibility of the witnesses and in its discretion not only found the other witnesses to be more credible than Jeffery but found Jeffery to be unbelievable.

---

[4] The term "nongrantor trust" does not appear in the Internal Revenue Code. For our purposes, it means an irrevocable trust where the beneficiary has no right to direct the distribution of income to himself/herself or to anyone legally dependent upon the beneficiary for support.

457

¶ 20. Jeffery's own trustee, Mike Elefante, testified in contradiction to Jeffery's claim that he did not really know that much about the trusts and that he did not even meet Elefante until 1995. Elefante said he first met Jeffery "sometime in the 1980s" and that he thereafter spoke to Jeffery on a quarterly basis to keep him informed on the trusts. Additionally, Jeffery confirmed that even before he and Tina divorced, he had set up a trust for their daughter. These examples support the trial court's conclusion that Jeffery could not have been as naïve as he claimed with regard to his status as a trust beneficiary and the nature of trusts in general.

¶ 21. Jeffery's testimony continued to be contradicted. Jeffery testified that in 1995, both he and Tina met with Elefante to discuss the trusts after his grandmother died. Yet, Tina and Elefante each testified that they had never met or spoken. Jeffery testified that though he reviewed and signed his tax returns, he did not understand them. Yet the trial court found "nothing [in evidence] to indicate that [Jeffery] would not be able to understand or comprehend looking at the basic numbers that are on the tax return to have some idea of the income that he would make from year to year."

¶ 22. The court reiterated its assessment stating that Jeffery's "behavior throughout the proceedings over the years [shows that he] certainly had knowledge of [his] wealth." The court found there was a "pattern that has proceeded throughout these matters [of] incredible testimony as to [Jeffery's] understanding or even knowledge of the assets that he had at hand" and a pattern of "inconsistencies that the Court just cannot reconcile." The court highlighted the "stark contrast" between Jeffery's significant assets and commensurate lifestyle and his child's, who was on reduced lunches when the proceedings first started. We find this con-

trast repugnant in light of the court's credibility assessment. that much of Jeffery's testimony regarding his knowledge of his assets was disingenuous. The court opined that if Jeffery had disclosed the assets that he had at the time of the divorce, it "certainly would have set support at a totally different level." Jeffery has managed to shirk his support obligations for years; he will not get away with it any longer.

■

¶ 23.   We agree with the trial court that in not revealing that he was a trust beneficiary, Jeffery failed to make proper financial disclosure at the time of the divorce as was required by WIS. STAT. § 767.27(1) (1995–96). Jeffery mistakenly argues that he was under no obligation to reveal that he was the beneficiary of various trusts because the distributions from those trusts were solely at the discretion of the trustee and therefore should not be considered for child support calculations.

¶ 24.   Our supreme court dealt with a similar case in *Grohmann v. Grohmann* (*Grohmann II*), 189 Wis. 2d 532, 525 N.W.2d 261 (1995). There, the court addressed the issue of whether undistributed income from a valid grantor trust should be used in calculating child support under WIS. ADMIN. CODE § HSS 80,[5] given that the parent who is obligated to pay child support is individually taxed as the grantor of the trust on the undistributed income of the trust. *See Grohmann II*, 189 Wis. 2d at 533–34. Thomas Grohmann had established an irrevocable trust which was funded with gifted assets. *Id.* at 534. The trustees were granted authority to make discretional distributions to Thomas and his children. *Id.* The trial court held that child support must be

---

[5] *See supra* note 2.

deducted from any discretionary payments made to Thomas but that the court lacked authority to order the trustees to pay distributions for child support purposes. *Id.* at 534–35.

¶ 25. In a published decision, we affirmed the decision of the trial court. *See Grohmann v. Grohmann* (*Grohmann I*), 180 Wis. 2d 690, 511 N.W.2d 312 (Ct. App. 1993). We held that "[i]f Thomas is obligated to report the trust's income as his own, then, regardless of whether Thomas has received any distribution, 17% of the trust income is payable as child support." *Id.* at 698. We remanded the case to the trial court to determine whether Thomas was, in fact, obligated to report the trust income as his own. *Id.* at 698–99. The trust subsequently petitioned the supreme court for review, which was granted. The supreme court affirmed this court's decision and held that "because Thomas C. Grohmann, as the grantor of the trust, is required under federal tax law to report the trust's income as his own, 17 percent of the trust income should be used to calculate child support . . . regardless of whether Thomas C. Grohmann has received any distribution." *Grohmann II*, 189 Wis. 2d at 538.

¶ 26. Jeffery attempts to draw a relevant distinction between a grantor trust and a nongrantor trust. He submits that the only income available to him for purposes of child support calculation is actual distributions made from the nongrantor trusts and income, other than capital gain income, available from the grantor trusts. We do not agree.

¶ 27. Based on our supreme court's rationale in *Grohmann II*, the grantor/nongrantor trust distinction, *for purposes of child support obligation,* is a distinction without a difference. This is so because *Grohmann I* held that if an income is reported as income for income

tax purposes, that income is deemed derived and realized whether it has been distributed or not. *See id.* at 538. Yes, the *Grohmann* decisions specifically addressed a grantor trust, but the "grantor" character of the trust did not drive the reasoning of the decisions. Rather, it was Grohmann's obligation to report the income of the trust that drove the courts' reasoning.

■

¶ 28.   Accordingly, the rationale of *Grohmann I* and *Grohmann II* is applicable to both grantor and nongrantor trusts *if* there is an obligation to report that trust's income as one's own because it is the obligation to report the income as one's own that makes the income reachable for calculations of child support obligation. It would be illogical to conclude otherwise. Specifically then, if a parent is obligated to report the trust's income as his or her own, then, regardless of whether he or she has received any distribution, a percentage of the trust income is payable as child support.[6] *See Grohmann I*, 180 Wis. 2d at 698. Jeffery is obligated to report his trust income as his own; thus, seventeen percent of the trust income is payable as child support.

■

¶ 29.   Jeffery argues that if we agree with the trial court that he failed to make proper financial disclosure at the time of the divorce, we should nonetheless hold that the trial court erred in making its retroactive calculations for child support from the time of the

---

[6] Seventeen percent is the percentage of the parent's monthly income standard mandate for one child. The standard mandates twenty-five percent for two children, twenty-nine percent for three children, thirty-one percent for four children and thirty-four percent for five or more children. *See* Wis. Admin. Code § DWD 40.03(1).

461

divorce. He argues that it should have limited the recalculations to the years 1997, 1998 and 1999 given that "[f]ull disclosure of all income tax returns from the year 2000 forward has been made and support set as a result of that disclosure." The trial court pointed out that because Jeffery played "such a cat and mouse game[,] it was extremely difficult to get a handle on how much he made." This is why, in the court's estimation, it was not sufficient to limit the child support recalculations to the years 1997, 1998 and 1999. Specifically, the trial court explained why it did not deem this to be the proper approach:

> I think by the time all [Jeffery's tax] returns were submitted and [Tina] had a chance to look at them, and study the whole issue as to what really transpired here—again, as the Court recalls through all of these proceedings, it truly, I think for lack of a better term, was such a cat and mouse game that it was extremely difficult to get a handle on how much he made and really it shouldn't have been all that difficult.

> It really shouldn't have been all that difficult but it was through some significantly obstructive behavior—it became very clear with Mr. Elefante it should not have been difficult to get those numbers from him right away if there just had been some amount of cooperation. So because it took some period of time to be able to analyze this and submit it in a rational form to the Court, I think [Tina] is entitled to the amounts as claimed other than the 2004 amounts.

¶ 30. We approve the trial court's calculations of Jeffery's child support obligation. In early 2007, when the court ordered an increase in child support based on Tina's January 21, 2004 motion for increased child support, the court was not aware that at the time of the divorce Jeffery had failed to make proper financial

disclosure as was required under Wɪs. Sᴛᴀᴛ. § 767.27(1) (1995–96). It was only after Tina filed her May 2006 motion to reopen the divorce that Jeffery's failure to disclose came to light. We agree with the trial court that this fact allows the court to reach back to the time of the divorce to make retroactive calculations based on the complete picture of Jeffery's income from that time. In other words, neither the court nor Tina should be hand tied to a ruling that was made while Jeffery was continuing to get away with his violation of the disclosure statute.

¶ 31. The trial court properly ruled that Jeffery either willfully or negligently failed to disclose all of the assets that he had at the time of divorce, namely his trust income. Jeffery was obligated to report his trust income as his own in 1997 when the judgment of divorce was entered. Thus, all trust income that is taxable to the beneficiary payer is income available for child support from the time it becomes taxable income.

¶ 32. We are convinced, as was the trial court, that had Jeffery fully disclosed his assets at the time of the divorce, the court would have set child support at a drastically different level. The court properly reopened the judgment of divorce and ordered a proper retroactive adjustment to Jeffery's child support obligation. Jeffery's game of "cat and mouse" is over.

*By the Court.*—Judgment affirmed.

¶ 33. BROWN, C.J. *(concurring)*. I just want to note that Jeffery has not claimed that the retroactive child support order in this case runs afoul of Wɪs. Sᴛᴀᴛ. § 767.59(1m) (prohibiting retroactive increases in support payments). *See also Foregger v. Foregger,* 40 Wis. 2d 632, 645, 162 N.W.2d 553 (1968); *Whitwam v.*

*Whitwam*, 87 Wis. 2d 22, 30, 273 N.W.2d 366 (Ct. App. 1978). Thus, the issue is waived.

¶ 34.   However, even had he raised this issue, it would have been rejected, in my opinion. We must read WIS. STAT. § 767.59(1m) in harmony with WIS. STAT. § 767.127(5), the statute at issue in this case. Read together, § 767.127(5) creates an exception to the statute prohibiting retroactive increases in child support and thereby furnishes the authority to transfer certain assets for support distribution.

¶ 35.   Moreover, the rule prohibiting retroactive increases in child support is not universal. In *Overson v. Overson*, 140 Wis. 2d 752, 759, 412 N.W.2d 896 (Ct. App. 1987), an exception was recognized to allow a trial court to adjust support obligations when a case is remanded from this court if an adjustment is necessary to avoid "unnecessary hardship."

¶ 36.   Finally, it is my view that what happened here was a fraud upon the court just as much as it was a fraud upon the payee spouse. In such cases, a motion under WIS. STAT. § 806.07(1)(g)—the statute allowing relief from a judgment if it is no longer equitable that the judgment should have prospective application— should be allowed to proceed if made in a reasonable time after discovery of the fraud. I note that this same issue was raised by the payee spouse in *Frisch v. Henrichs*, 2007 WI 102, ¶ 27 n.12, 304 Wis. 2d 1, 736 N.W.2d 85, but was not considered by the supreme court. The fact that it was not considered at that time does not mean it lacks vitality where there has been a fraud on the court due to the intentional hiding of financial information from the family court.